## Adoptions of B.L.V.B. and E.L.V.B.

[628 A.2d 1271]

No. 92-321

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed June 18, 1993

*Julie A. Frame, David W. Curtis* and *Leslie J. Dunn* of *Hoff, Agel, Curtis & Cassidy, P.C.*, Burlington, for Plaintiffs-Appellants.

*Paula L. Ettelbrick,* Lambda Legal Defense & Education Fund, Inc., New York, New York, and *Susan M. Murray* of *Langrock Sperry & Wool,* Middlebury, for Amici Curiae.

**Johnson, J.** The issue we decide today is whether Vermont law requires the termination of a natural mother's parental rights if her children are adopted by a person to whom she is not married. We hold that when the family unit is comprised of the natural mother and her partner, and the adoption is in the best interests of the children, terminating the natural mother's rights is unreasonable and unnecessary. We reverse.

Appellants are two women, Jane and Deborah, who have lived together in a committed, monogamous relationship since 1986. Together, they made the decision to have and raise children, and together, they consulted various sources to determine the best method for them to achieve their goal of starting a family. On November 2, 1988, Jane gave birth to a son, B.L.V.B., after being impregnated with the sperm of an anonymous donor. On August 27, 1992, after being impregnated with sperm from the same donor, she gave birth to a second son, E.L.V.B. Deborah assisted the midwife at both births, and she has been equally responsible for raising and parenting the children since their births.

Appellants sought legal recognition of their existing status as co-parents, and asked the probate court to allow Deborah to

legally adopt the children, while leaving Jane's parental rights intact. The adoption petitions were uncontested. The Department of Social and Rehabilitation Services conducted a home study, determined the adoptions were in the best interests of the children, and recommended that they be allowed. A clinical and school psychologist who had evaluated the family testified that it was essential for the children to be assured of a continuing relationship with Deborah, and recommended that the adoptions be allowed for the psychological and emotional protection of the children.

Despite the lack of opposition, the probate court denied the adoptions, declining to reach whether the adoptions were in the best interests of the children because the proposed adoptive mother "does not satisfy the statutory prerequisite to adoption." The court relied on 15 V.S.A. §§ 431 and 448. Section 431, covering who may adopt, provides:

> A person or husband and wife together, of age and sound mind, may adopt any other person as his or their heir with or without change of name of the person adopted. A married man or a married woman shall not adopt a person or be adopted without the consent of the other spouse. The petition for adoption and the final adoption decree shall be executed by the other spouse as provided in this chapter.

Section 448, which describes how the rights and obligations of both parents and children are altered by a final adoption decree, provides in pertinent part:

> The natural parents of a minor shall be deprived, by the adoption, of all legal right to control of such minor, and such minor shall be freed from all obligations of obedience and maintenance to them. . . . Notwithstanding the foregoing provisions of this section, when the adoption is made by a spouse of a natural parent, obligations of obedience to, and rights of inheritance by and through the natural parent who has intermarried with the adopting parent shall not be affected.

The court read the last sentence of § 448, the "step-parent exception," and § 431, as clearly requiring that "if a couple adopts together, they must be married. If one partner is the birth parent, and the other partner desires to adopt, then they must be

married: otherwise, the birth parent will lose rights in the child under § 448."

Appellants make numerous attacks on the probate court's interpretation of the statutes, but in the main, they contend that the statutory language does not prohibit the adoptions, that enforcing the termination of the birth mother's rights under § 448 would reach an absurd result in these circumstances, and that such a result is inconsistent with the best interests of the children and the public policy of this state. We agree.

■■ In interpreting Vermont's adoption statutes, we are mindful that the state's primary concern is to promote the welfare of children, *In re Camp*, 94 Vt. 455, 458, 111 A. 565, 567 (1920), and that application of the statutes should implement that purpose.[1] See *In re S.B.L.*, 150 Vt. 294, 301–02, 553 A.2d 1078, 1083-84 (1988) (in applying custody statute to fact pattern breaking substantial new ground, intent of legislature, gleaned from whole of statute, must be considered). In doing so, we must avoid results that are irrational, unreasonable or absurd. *Id.* at 301, 553 A.2d at 1083. We must look "not only at the letter of a statute but also its reason and spirit." *Id.*

Nothing in Vermont law, other than a restrictive interpretation of § 448, would exclude Deborah from adopting another person. Under 15 V.S.A. § 431, which broadly grants the right to adopt to "a person or husband and wife together," an unmarried person is permitted to adopt, and the sole limitation — that the adoption of a married person requires the consent of the adoptee's spouse — does not apply here. Even reading § 431 in conjunction with § 448, we cannot conclude, as the probate

---

[1] Curiously, the words "best interests" of the child appear only once in the adoption chapter, in the form signed by the parent surrendering the child for adoption. 15 V.S.A. § 432(c). It is apparent from the evolution of the adoption statutes in Vermont, however, that the interests of children themselves, as opposed to children as chattels, came to be emphasized in the major revisions of the adoption chapter in 1945 and 1947. L. D'Agostino, *The History of Public Welfare in Vermont*, 165–77 (1948). We may also infer, from other sections of the adoption chapter, that the interests of the children have indeed become the central focus of legislative enactments governing adoption procedures. See, e.g., 15 V.S.A. § 437 (requiring an investigation of the proposed adoptive home), §§ 441–443 (requiring hearing on proposed adoption), and § 440 (requiring a trial period for placement).

court did, that the legislature meant to limit the categories of persons who were entitled to adopt.

Section 448 was passed by the legislature in 1945, then revised and adopted in substantially its present form in 1947.[2] It is highly unlikely that the legislature contemplated the possibility of adoptions by same-sex partners, and the scant legislative history does not indicate that such adoptions were considered. See Record of Committee Meetings for H. 206, Judiciary Committee (March 14, 1945). Because adoptions by same-sex partners were apparently not contemplated when § 448 was drafted, it cannot be said that they are either specifically prohibited or specifically allowed by the statute. To determine whether such adoptions are consistent with the purpose of the statute, it is necessary to discern what § 448 was designed to accomplish.

When the statute is read as a whole, we see that its general purpose is to clarify and protect the legal rights of the adopted person at the time the adoption is complete, not to proscribe adoptions by certain combinations of individuals. Who may adopt is already covered by § 431. Section 448 is concerned with defining the lines of inheritance for adoptees, preserving their right to inherit from their natural parents and granting the right to inherit from the "person or persons" by whom they are adopted. The statute also terminates the natural parents' rights upon adoption, but this provision anticipates that the adoption of children will remove them from the home of the biological parents, where the biological parents elect or are compelled to terminate their legal obligations to the child. This legislative intent is evidenced by the step-parent exception, which saves the natural parent's rights in a step-parent adoption. The legislature recognized that it would be against common sense to terminate the biological parent's rights when that parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child.

---

[2] Section 448 was amended only once after 1947, in 1963, to delete a "the" in the fourth sentence, and to add the phrase "predecessors in line of descent, and collateral kin" in the fifth sentence.

■ Although the precise circumstances of these adoptions may not have been contemplated during the initial drafting of the statute, the general intent and spirit of § 448 is entirely consistent with them. The intent of the legislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents. Despite the narrow wording of the step-parent exception, we cannot conclude that the legislature ever meant to terminate the parental rights of a biological parent who intended to continue raising a child with the help of a partner. Such a narrow construction would produce the unreasonable and irrational result of defeating adoptions that are otherwise indisputably in the best interests of children. See *Lubinsky v. Fair Haven Zoning Board*, 148 Vt. 47, 50, 527 A.2d 227, 228 (1986)(intent of statute is derived from consideration not only of language, but from entire enactment, its reason, purpose and consequence, and on presumption that no unjust or unreasonable result was intended).

Although no state supreme court has confronted the issue, a number of lower court decisions support our conclusion. Interpreting a similar "step-parent exception" in a factually similar adoption case, the Superior Court for the District of Columbia stated that cutting off the biological mother's rights "would be a particularly counterproductive and even ludicrous result" once the adoption by the mother's partner was found to be in the child's best interest. *In re L.S. & V.L.*, No. A-269-90 and A-270-90, slip op. at 5 (D.C. Super. Ct. Fam. Div. Aug. 30, 1991). Instead, following the legislative intent, the court likened same-sex partners who adopted to step-parents, holding them exempt from the provision cutting off a biological parent's rights. *Id.* at 8.[3]

---

[3] The issue now before us is not a case of first impression even in Vermont. Following *L.S. & V.L.* and numerous other out-of-state lower-court precedents, the Addison Probate Court recently allowed the female partner of a child's adoptive mother to adopt the child as a second parent. *In re Adoption of R.C.*, No. 9088, slip op. at 5–7 (Addison Prob. Ct. Dec. 9, 1991). Finding that § 448 was not intended to apply to the situation before the court and that the adoption was in the best interests of the child, the court held that the termination of rights in § 448 should be read as directory rather than

A New York court also upheld the adoption of a child by the biological mother's same-sex partner under a section of its adoption statute[4] identical in effect to that of Vermont's § 448. That court stated that:

> [i]f this provision were strictly enforced it would require termination of the parental rights of [the biological mother] upon granting the adoption to [the mother's partner]. This would be an absurd outcome which would nullify the advantage sought by the proposed adoption: the creation of a legal family unit identical to the actual family setup.

*In re Evan*, 583 N.Y.S.2d 997, 1000 (Sur. Ct. 1992). The court further stated that where the adoptive and biological parents are in fact co-parents, "New York law does not require a destructive choice between the two parents. Allowing continuation of the rights of both the natural and adoptive parent where compelled by the best interests of the child, is the only rational result and well within the equitable power of this court." *Id.*

Moreover, focusing on the best interests of the adopted child has led courts, in other contexts, to allow a mother's partner to adopt without terminating the mother's rights. For example, in *In re Adoption of a Child by A.R.*, 378 A.2d 87 (Union Cty. Ct. Prob. Div. 1977), a New Jersey court allowed an unmarried biological father to adopt as though he were the stepfather of the child because the biological mother, to whom the father had been engaged, was incompetent and thus unable to marry. The court stated that a section of the adoption statute similar to Vermont's § 448 "must be read against the peculiar factual setting of [the] case, and with an application of common sense" in order to further the public policy of "the protection of the children and the adoptive and natural parents." *Id.* at 89.

Similarly, in *In re A.J.J.*, 438 N.Y.S.2d 444 (Sur. Ct. 1981), the biological parents of A.J.J. refused to marry for political reasons. The New York court permitted the biological father to

---

mandatory. *Id.* at 7. Although we do not follow this rationale, we note that other courts have not found § 448, or like statutes, to be a prohibition on adoptions by same-sex parents.

[4] New York's Domestic Relations Law § 117(1) provides that "natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child."

adopt "in the same manner as if the petitioning father were the stepfather of the adoptive child," thereby preserving the biological mother's rights. *Id.* at 446. That court stated:

> Society changes and, with it, so do mores. In this era of freedom of choice and equality or rights for both parties, the child should not be denied the privilege of legitimacy as well as the care and concern of his natural mother's property and her rights of intestacy merely because these adult natural parents refuse to marry. . . . The refusal by these natural parents to wed should not contravene New York's policy of fostering the child's best interests above all else.

*Id.*

■ ■ When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest. As the New York court stated in *Evan*:

> [T]his is not a matter which arises in a vacuum. Social fragmentation and the myriad configurations of modern families have presented us with new problems and complexities that can not be solved by idealizing the past. Today a child who receives proper nutrition, adequate schooling and supportive sustaining shelter is among the fortunate, whatever the source. A child who also receives the love and nurture of even a single parent can be counted among the blessed. Here this Court finds a child who has all of the above benefits and *two* adults dedicated to his welfare, secure in their loving partnership, and determined to raise him to the very best of their considerable abilities. There is no reason in law, logic or social philosophy to obstruct such a favorable situation.

583 N.Y.S.2d at 1002 (emphasis in original). By allowing same-sex adoptions to come within the step-parent exception of § 448, we are furthering the purposes of the statute as was originally intended by allowing the children of such unions the benefits and security of a legal relationship with their de facto second parents.

As the case law from other jurisdictions illustrates, our paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate. the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support. Case law and commentary on the subject detail the years of litigation spent in settling these difficult issues while the children remain in limbo, sometimes denied the affection of a "parent" who has been with them from birth. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families*, 78 Geo. L. J. 459, 508–22 (1990); Comment, *Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother*, 19 U.C. Davis L. Rev. 729, 741–45 (1986). It is surely in the best interests of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations laws.

We are not called upon to approve or disapprove of the relationship between the appellants. Whether we do or not, the fact remains that Deborah has acted as a parent of B.L.V.B. and E.L.V.B. from the moment they were born. To deny legal protection of their relationship, as a matter of law, is inconsistent with the children's best interests and therefore with the public policy of this state, as expressed in our statutes affecting children.[5]

---

[5] See 15 V.S.A. §§ 431–454 (adoption); 15 V.S.A. §§ 291–296 (support of spouse and care of children); 15 V.S.A. § 301 (legal rights, privileges, duties and

Because the probate court rejected these adoptions on legal grounds, it did not make findings on whether the adoptions were, in fact, in the best interests of the children. Ordinarily, this would require a remand to the probate court; however, in light of the fact that the adoptions were unopposed, that all of the evidence stands uncontroverted, that the adoption was investigated and recommended by the state, through SRS, and that there is not a scintilla of evidence in the record to suggest that the adoptions are not in the best interests of these children, no reason exists to remand for another hearing.

*Reversed; judgment is entered granting the petitions for adoption in Docket Nos. 5813 and 5814 of the Washington Probate Court.*

obligations of parents to be established for benefit of children, regardless of whether child is born during marriage or out of wedlock); 15 V.S.A. § 665 (custody to be awarded upon best interests of child), § 666(c) (parental agreements on custody not in best interests of children shall not be approved by court), § 668 (custody modifications must be in best interests of children), and § 669 (guardians ad litem must represent best interests of children); 33 V.S.A. § 5540 (best interests of child shall be considered in disposition hearing on custody of minor).