## ADOPTION OF TAMMY.

Middlesex. May 4, 1993. - September 10, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Adoption,* Standing. *Parent and Child,* Adoption. *Minor,* Adoption. *Jurisdiction,* Probate Court. *Probate Court,* Jurisdiction, Parties.

Nothing in the provisions of the adoption statute, G. L. c. 210, precludes the joint adoption of a child by two unmarried individuals. [210-212] NOLAN, J., dissenting. LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

In the circumstances of an adoption case, the judge correctly concluded that the joint adoption of a child by two unmarried individuals was in the best interests of the child. [212-215] NOLAN, J., dissenting.

This court, reading the adoption statute (G. L. c. 210) as a whole, concluded that when a natural parent is a party to a joint adoption petition, that parent's legal relationship to the child does not terminate (pursuant to the provisions of § 6 of the statute) on entry of the adoption decree. [215-216]

PETITION filed in the Middlesex Division of the Probate and Family Court Department on December 13, 1990.

The case was heard by *Sheila E. McGovern,* J., and was reported by her to the Appeals Court. The Supreme Judicial Court transferred the case on its own initiative.

*Justine H. Brousseau (Laura R. Studen* with her) for the minor.

*Katherine Triantafillou (Joyce Kauffman & Mary Notaris* with her) for the petitioners.

*Mary L. Bonauto,* for Gay & Lesbian Advocates & Defenders & others, amici curiae, submitted a brief.

*Clare C. Conley, Jamie Ann Sabino, Jacquelynne Bowman, Carol Brill, John R. Jackson & Elaine M. Epstein,* for Women's Bar Association of Massachusetts & others, amici curiae, submitted a brief.

GREANEY, J. In this case, two unmarried women, Susan and Helen, filed a joint petition in the Probate and Family Court Department under G. L. c. 210, § 1 (1992 ed.), to adopt as their child Tammy, a minor, who is Susan's biological daughter. Following an evidentiary hearing, a judge of the Probate and Family Court entered a memorandum of decision containing findings of fact and conclusions of law. Based on her finding that Helen and Susan "are each functioning, separately and together, as the custodial and psychological parents of [Tammy]," and that "it is the best interest of said [Tammy] that she be adopted by both," the judge entered a decree allowing the adoption. Simultaneously, the judge reserved and reported to the Appeals Court the evidence and all questions of law, in an effort to "secure [the] decree from any attack in the future on jurisdictional grounds." See G. L. c. 215, § 13 (1992 ed.). See also *Adoption of Thomas*, 408 Mass. 446 (1990). We transferred the case to this court on our own motion. We conclude that the adoption was properly allowed under G. L. c. 210.[1]

We summarize the relevant facts as found by the judge. Helen and Susan have lived together in a committed relationship, which they consider to be permanent, for more than ten years. In June, 1983, they jointly purchased a house in Cambridge. Both women are physicians specializing in surgery. At the time the petition was filed, Helen maintained a private practice in general surgery at Mount Auburn Hospital and Susan, a nationally recognized expert in the field of breast cancer, was director of the Faulkner Breast Center and a surgical oncologist at the Dana Farber Cancer Insti-

---

[1] The judge also decreed, as an alternative to the adoption ordered under G. L. c. 210, "[I]t would be in the best interest of the child to permit [Helen] to adopt [Tammy] and [Susan] to retain postadoptive parental rights of custody and visitation pursuant to its equitable powers, under G. L. c. 215." Because we conclude that the adoption was properly allowed under G. L. c. 210, we need not consider the alternative equitable ground relied on by the judge in permitting Helen to adopt Tammy and Susan to maintain postadoptive rights.

tute. Both women also held positions on the faculty of Harvard Medical School.

For several years prior to the birth of Tammy, Helen and Susan planned to have a child, biologically related to both of them, whom they would jointly parent. Helen first attempted to conceive a child through artificial insemination by Susan's brother. When those efforts failed, Susan successfully conceived a child through artificial insemination by Helen's biological cousin, Francis. The women attended childbirth classes together and Helen was present when Susan gave birth to Tammy on April 30, 1988. Although Tammy's birth certificate reflects Francis as her biological father, she was given a hyphenated surname using Susan and Helen's last names.

Since her birth, Tammy has lived with, and been raised and supported by, Helen and Susan. Tammy views both women as her parents, calling Helen "mama" and Susan "mommy." Tammy has strong emotional and psychological bonds with both Helen and Susan. Together, Helen and Susan have provided Tammy with a comfortable home, and have created a warm and stable environment which is supportive of Tammy's growth and over-all well being. Both women jointly and equally participate in parenting Tammy, and both have a strong financial commitment to her. During the work week, Helen usually has lunch at home with Tammy, and on weekends both women spend time together with Tammy at special events or running errands. When Helen and Susan are working, Tammy is cared for by a nanny. The three vacation together at least ten days every three to four months, frequently spending time with Helen's and Susan's respective extended families in California and Mexico. Francis does not participate in parenting Tammy and does not support her. His intention was to assist Helen and Susan in having a child, and he does not intend to be involved with Tammy, except as a distant relative. Francis signed an adoption surrender and supports the joint adoption by both women.

Helen and Susan, recognizing that the laws of the Commonwealth do not permit them to enter into a legally cogni-

zable marriage, believe that the best interests of Tammy require legal recognition of her identical emotional relationship to both women. Susan expressed her understanding that it may not be in her own long-term interest to permit Helen to adopt Tammy because, in the event that Helen and Susan separate, Helen would have equal rights to primary custody. Susan indicated, however, that she has no reservation about allowing Helen to adopt. Apart from the emotional security and current practical ramifications which legal recognition of the reality of her parental relationships will provide Tammy, Susan indicated that the adoption is important for Tammy in terms of potential inheritance from Helen. Helen and her living issue are the beneficiaries of three irrevocable family trusts. Unless Tammy is adopted, Helen's share of the trusts may pass to others. Although Susan and Helen have established a substantial trust fund for Tammy, it is comparatively small in relation to Tammy's potential inheritance under Helen's family trusts.

Over a dozen witnesses, including mental health professionals, teachers, colleagues, neighbors, blood relatives and a priest and nun, testified to the fact that Helen and Susan participate equally in raising Tammy, that Tammy relates to both women as her parents, and that the three form a healthy, happy, and stable family unit. Educators familiar with Tammy testified that she is an extremely well-adjusted, bright, creative, cheerful child who interacts well with other children and adults. A priest and nun from the parties' church testified that Helen and Susan are active parishioners, that they routinely take Tammy to church and church-related activities, and that they attend to the spiritual and moral development of Tammy in an exemplary fashion. Teachers from Tammy's school testified that Helen and Susan both actively participate as volunteers in the school community and communicate frequently with school officials. Neighbors testified that they would have no hesitation in leaving their own children in the care of Helen or Susan. Susan's father, brother, and maternal aunt, and Helen's cousin testified in favor of the joint adoption. Members of both

women's extended families attested to the fact that they consider Helen and Susan to be equal parents of Tammy. Both families unreservedly endorsed the adoption petition.

The Department of Social Services (department) conducted a home study in connection with the adoption petition which recommended the adoption, concluding that "the petitioners and their home are suitable for the proper rearing of this child." Tammy's pediatrician reported to the department that Tammy receives regular pediatric care and that she "could not have more excellent parents than Helen and Susan." A court-appointed guardian ad litem, Dr. Steven Nickman, assistant clinical professor of psychiatry at Harvard Medical School, conducted a clinical assessment of Tammy and her family with a view toward determining whether or not it would be in Tammy's best interests to be adopted by Helen and Susan. Dr. Nickman considered the ramifications of the fact that Tammy will be brought up in a "non-standard" family. As part of his report, he reviewed and referenced literature on child psychiatry and child psychology which supports the conclusion that children raised by lesbian parents develop normally. In sum, he stated that "the fact that this parent-child constellation came into being as a result of thoughtful planning and a strong desire on the part of these women to be parents to a child and to give that child the love, the wisdom and the knowledge that they possess . . . [needs to be taken into account] . . . . The maturity of these women, their status in the community, and their seriousness of purpose stands in contrast to the caretaking environments of a vast number of children who are born to heterosexual parents but who are variously abused, neglected and otherwise deprived of security and happiness." Dr. Nickman concluded that "there is every reason for [Helen] to become a legal parent to Tammy just as [Susan] is," and he recommended that the court so order. An attorney appointed to represent Tammy's interests also strongly recommended that the joint petition be granted.

Despite the overwhelming support for the joint adoption and the judge's conclusion that joint adoption is clearly in

Tammy's best interests, the question remains whether there is anything in the law of the Commonwealth that would prevent this adoption. The law of adoption is purely statutory, *Davis* v. *McGraw*, 206 Mass. 294, 297 (1910), and the governing statute, G. L. c. 210 (1992 ed.), is to be strictly followed in all its essential particulars. *Purinton* v. *Jamrock*, 195 Mass. 187, 197 (1907). To the extent that any ambiguity or vagueness exists in the statute, judicial construction should enhance, rather than defeat, its purpose. *Hayon* v. *Coca Cola Bottling Co. of New England*, 375 Mass. 644, 648-649 (1978). *Vallin* v. *Bondesson*, 346 Mass. 748, 753 (1964). The primary purpose of the adoption statute, particularly with regard to children under the age of fourteen, is undoubtedly the advancement of the best interests of the subject child. See G. L. c. 210, §§ 3, 4A, 5A, 5B, 6. See also *Adoption of a Minor*, 343 Mass. 292, 294-296 (1961); *Krakow* v. *Department of Pub. Welfare*, 326 Mass. 452, 455-456 (1950); *Erickson* v. *Raspperry*, 320 Mass. 333, 335 (1946); *Merrill* v. *Berlin*, 316 Mass. 87, 89 (1944); *Bottoms* v. *Carlz*, 310 Mass. 29 (1941); *Purinton* v. *Jamrock, supra* at 199 ("[I]t is the right of the children that is protected by this statute. . . . The first and paramount duty is to consult the welfare of the child"). With these considerations in mind, we examine the statute to determine whether adoption in the circumstances of this case is permitted.

1. The initial question is whether the Probate Court judge had jurisdiction under G. L. c. 210 to enter a judgment on a joint petition for adoption brought by two unmarried cohabitants in the petitioners' circumstances. We answer this question in the affirmative.

There is nothing on the face of the statute which precludes the joint adoption of a child by two unmarried cohabitants such as the petitioners. Chapter 210, § 1, provides that "[a] person of full age may petition the probate court in the county where he resides for leave to adopt as his child another person younger than himself, unless such other person is his or her wife or husband, or brother, sister, uncle or

aunt, of the whole or half blood."[2] Other than requiring that a spouse join in the petition, if the petitioner is married and the spouse is competent to join therein, the statute does not expressly prohibit or require joinder by any person.[3] Although the singular "a person" is used, it is a legislatively mandated rule of statutory construction that "[w]ords importing the singular number may extend and be applied to several persons" unless the resulting construction is "incon-

---

[2]There is no question that Helen and Susan each individually satisfy the identity requirements of G. L. c. 210, § 1. Although the adoption statute, as it first appeared (St. 1851, c. 324) precluded a person from adopting his or her own child by birth, the statute was amended to permit adoption by the child's natural parents. *Curran, petitioner*, 314 Mass. 91 (1943) (natural mother of child born out of wedlock proper party to adoption petition). None of the prohibitions to adoption set forth in § 1 is applicable. Furthermore, there is nothing in the statute that prohibits adoption based on gender or sexual orientation. Contrast Fla. Stat. § 63.042 (3) (1991) (prohibiting homosexuals from adopting); N.H. Rev. Stat. Ann. § 170-B:4 (1990) (same). Nor is homosexuality a bar to custody. *Bezio* v. *Patenaude*, 381 Mass. 563, 579 (1980).

[3]The provision concerning joinder of spouses is a requirement that has been present in the statute since its enactment in 1851. See St. 1851, c. 324, § 4 ("No petition by a person having a lawful wife shall be allowed unless such wife shall join therein, and no woman having a lawful husband shall be competent to present and prosecute such petition"). Adoption by a married person has the effect of changing the legal duties of both spouses because the "infant who is adopted becomes the child not of one but of both." *Lee* v. *Wood*, 279 Mass. 293, 295 (1932). Both spouses must freely consent to join in the adoption petition. *Phillips* v. *Chase*, 203 Mass. 556, 565 (1909). If a person falsely claims to be the legal spouse of another, the Probate Court may vacate the adoption decree. See *Lee* v. *Wood, supra* at 296.

The required joinder of spouses, which is jurisdictional in nature, see *Mitchell* v. *Mitchell*, 312 Mass. 154, 163 (1942); *Lee* v. *Wood, supra* at 295; *Davis* v. *McGraw*, 206 Mass. 294, 298 (1910), does not by its terms apply to joint petitions by unmarried persons who seek to adopt. See *Adoption of B.L.V.B.*, 160 Vt. 368 (1993) (requirement of joinder of spouses in Vermont adoption statute does not bar adoption by same-sex partner of children's natural mother); *Matter of A.J.J.*, 108 Misc. 2d 657, 659-660 (N.Y. Sur. Ct. 1981) (natural parents decided not to marry; natural father permitted, with mother's consent, to adopt as if he were married to mother); *Matter of the Adoption of a Child by A.R.*, 152 N.J. Super. 541, 545 (1977) (natural father permitted to adopt his illegitimate child without marrying mother or terminating mother's legal relationship to child).

sistent with the manifest intent of the law-making body or repugnant to the context of the same statute." G. L. c. 4, § 6 (1992 ed.). In the context of adoption, where the legislative intent to promote the best interests of the child is evidenced throughout the governing statute, and the adoption of a child by two unmarried individuals accomplishes that goal, construing the term "person" as "persons" clearly enhances, rather than defeats, the purpose of the statute. Furthermore, it is apparent from the first sentence of G. L. c. 210, § 1, that the Legislature considered and defined those combinations of persons which would lead to adoptions in violation of public policy. Clearly absent is any prohibition of adoption by two unmarried individuals like the petitioners.

While the Legislature may not have envisioned adoption by same-sex partners, there is no indication that it attempted to define all possible categories of persons leading to adoptions in the best interests of children.[4] Rather than limit the potential categories of persons entitled to adopt (other than those described in the first sentence of § 1), the Legislature used general language to define who may adopt and who may be adopted. The Probate Court has thus been granted jurisdiction to consider a variety of adoption petitions. See *Adoption of Thomas*, 408 Mass. 446, 449-451 (1990). The limitations on adoption that do exist derive from the written

---

[4]Children in earlier times who lacked two married and living parents, just as many children today, were often adopted into "non-standard" families. See e.g., *Curran, petitioner, supra* (child born out of wedlock adopted by unmarried natural mother); *Delano v. Bruerton*, 148 Mass. 619 (1889) (grandfather adopted grandson, child of his deceased son). By permitting adoption by unmarried persons, the Legislature clearly sanctioned adoption into "non-standard" families. Moreover, the Legislature could easily have contemplated circumstances leading to adoption by more than one unmarried party, albeit in circumstances different from this case. For example, orphaned children are frequently taken in and raised by relatives, who may be unmarried siblings, aunts or uncles, or cousins of their parents. See, e.g., *Merrill v. Berlin*, 316 Mass. 87, 89 (1944) (court found that it was in the best interests of two orphaned boys to be raised by their deceased mother's aunt and two female cousins, despite the "wholly feminine" nature of the household).

consent requirements contained in § 2,[5] from specific conditions set forth in § 2A, which must be satisfied prior to the adoption of a child under the age of fourteen,[6] and from several statutory and judicial directives[7] which essentially restrict adoptions to those which have been found by a judge to be in the best interests of the subject child. See *Merrill* v. *Berlin, supra* at 89 (in dismissing elderly grandparents' petition to adopt following death of children's parents, and retaining custody with three female testamentary guardians,

---

[5]General Laws c. 210, § 2 (1992 ed.), provides in relevant part: "A decree of adoption shall not be made, except as provided in this chapter, without the written consent of the child to be adopted, if above the age of twelve; of the child's spouse, if any; of the lawful parents, who may be previous adoptive parents, or surviving parent; or of the mother only if the child was born out of wedlock and not previously adopted. A person whose consent is hereby required shall not be prevented from being the adoptive parent." Susan's request to adopt her own child and her consent to Helen's adoption of Tammy satisfies the statute. Although not required by the statute, Francis, the biological father, has provided his written consent to the joint adoption.

The written consent of the child's natural parents is not required if the court has terminated the natural parents' legal rights to the child because there has been a showing by clear and convincing evidence that the natural parents are unfit. G. L. c. 210, § 3 (1992 ed.).

[6]A decree of adoption may not be entered unless one of five preconditions set forth in G. L. c. 210, § 2A, is satisfied. These preconditions include a showing that "the petitioner is a blood relative of the child sought to be adopted" or that "[t]he petition for adoption has been approved in writing by the department of social services or by an agency authorized by said department." Because both Susan and Helen are blood relatives of Tammy, and the department has approved the adoption, two of the preconditions have been satisfied in this case.

[7]The judge is directed to consider "all factors relevant to the physical, mental and moral health of the child" and a decree of adoption may be entered only after the judge has determined that the adopting parties are "of sufficient ability to bring up the child and provide suitable support and education for it, and that the child should be adopted." G. L. c. 210, §§ 5B, 6. Additionally, we have stated, with regard to establishing the status of legal parent, that the judge "must look at the relationship [between the parent and the child] as a whole, and consider emotional bonds, economic support, custody of the child, the extent of personal association, the commitment of the [parent] to attending to the child's needs, the consistency of the [parent's] expressed interest . . . and any other factors which bear on the nature of the alleged parent-child relationship." *C.C.* v. *A.B.*, 406 Mass. 679, 690 (1990).

the court stated "[t]he only question [to be considered] is whether the best interests of the children would be served by their adoption").

In this case all requirements in §§ 2 and 2A are met, and there is no question that the judge's findings demonstrate that the directives set forth in §§ 5B and 6, and in case law, have been satisfied. Adoption will not result in any tangible change in Tammy's daily life; it will, however, serve to provide her with a significant legal relationship which may be important in her future. At the most practical level, adoption will entitle Tammy to inherit from Helen's family trusts and from Helen and her family under the law of intestate succession (G. L. c. 210, § 6), to receive support from Helen, who will be legally obligated to provide such support (G. L. c. 209C, § 9; G. L. c. 273, § 1 [1992 ed.]), to be eligible for coverage under Helen's health insurance policies, and to be eligible for social security benefits in the event of Helen's disability or death (42 U.S.C. § 402 [d] [1988]).

Of equal, if not greater significance, adoption will enable Tammy to preserve her unique filial ties to Helen in the event that Helen and Susan separate, or Susan predeceases Helen.[8] As the case law and commentary on the subject illustrate, when the functional parents of children born in circumstances similar to Tammy separate or one dies, the children often remain in legal limbo for years while their future is disputed in the courts. Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo. J.L. 459, 508-522 (1990); Comment, Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother, 19 U.C. Davis L. Rev. 729, 741-745 (1986). In some cases, children have been denied the affec-

---

[8]Although Susan has designated Helen guardian of Tammy in her will, Helen's custody of Tammy could conceivably be contested in the event of Susan's death, particularly by Francis, members of his family or members of Susan's family. Absent adoption, Helen would not have a dispositive legal right to retain custody of Tammy, because she would be a "legal stranger" to the child.

tion of a functional parent who has been with them since birth, even when it is apparent that this outcome is contrary to the children's best interests.[9] Adoption serves to establish legal rights and responsibilities so that, in the event that problems arise in the future, issues of custody and visitation may be promptly resolved by reference to the best interests of the child within the recognized framework of the law. See G. L. c. 209C, § 10. See also *Adoption of B.L.V.B.*, 160 Vt. 368 (1993). There is no jurisdictional bar in the statute to the judge's consideration of this joint petition. The conclusion that the adoption is in the best interests of Tammy is also well warranted.

2. The judge also posed the question whether, pursuant to G. L. c. 210, § 6 (1992 ed.), Susan's legal relationship to Tammy must be terminated if Tammy is adopted. Section 6 provides that, on entry of an adoption decree, "all rights, duties and other legal consequences of the natural relation of child and parent shall . . . except as regards marriage, incest

---

[9]Cases from other jurisdictions demonstrate the difficulties resulting from the lack of an established legal relationship between a child and its second functional parent. See, e.g., *In re the Interest of Z.J.H.*, 162 Wis. 2d 1002, 1033 (1991) (Bablitch, J., dissenting) (former lesbian partner of child's adoptive mother, who had planned on adoption, cultivated "parent-like" relationship with child since his birth, and had been child's primary caretaker, denied both visitation and custody after partners' separation due to lack of legal relationship with child; court refused to consider issue of child's best interests); *Nancy S.* v. *Michele G.*, 228 Cal. App. 3d 831, 840 & n.8 (1991) (two children conceived by artificial insemination during lesbian couple's relationship deemed legal children of natural mother only, who was granted sole physical and legal custody following the couple's separation; appellate court recognized that adoption would avoid this "unfortunate situation" noting that "we see nothing in [our statutory] provisions [similar to those in Massachusetts] that would preclude a child from being jointly adopted by someone of the same sex as the natural parent"); *In re Pearlman*, 15 Fam. L. Rep. (BNA) 1355 (Fla. Cir. Ct. 1989) (unreported) (custody of child conceived by artificial insemination during lesbian couple's relationship awarded to "de facto" parent after four years of litigation with child's maternal grandparents following death of natural mother; child, who had been separated from her functional parent and suffered anxiety as a result, told the court "for Christmas I don't really want a present. All I want is to live with Neenie ['de facto' parent]").

or cohabitation, terminate between the child so adopted and his natural parents and kindred." Although G. L. c. 210, § 2, clearly permits a child's natural parent to be an adoptive parent, § 6 does not contain any express exceptions to its termination provision. The Legislature obviously did not intend that a natural parent's legal relationship to the child be terminated when the natural parent is a party to the adoption petition.

Section 6 clearly is directed to the more usual circumstances of adoption, where the child is adopted by persons who are not the child's natural parents (either because the natural parents have elected to relinquish the child for adoption or their parental rights have been involuntarily terminated). The purpose of the termination provision is to protect the security of the child's newly-created family unit by eliminating involvement with the child's natural parents. Although it is not uncommon for a natural parent to join in the adoption petition of a spouse who is not the child's natural parent, see, e.g., *Adoption of a Minor (No. 1)*, 367. Mass. 907 (1975); *Erickson v. Raspperry*, 320 Mass. 333 (1946), the statute has never been construed to require the termination of the natural parent's legal relationship to the child in these circumstances. Nor has § 6 been construed to apply when the natural mother petitions alone to adopt her child born out of wedlock. See *Curran, petitioner*, 314 Mass. 91 (1943). Reading the adoption statute as a whole, we conclude that the termination provision contained in § 6 was intended to apply only when the natural parents (or parent) are not parties to the adoption petition.[10]

3. We conclude that the Probate Court has jurisdiction to enter a decree on a joint adoption petition brought by the

---

[10]In interpreting a provision similar to G. L. c. 210, § 6, the Vermont Supreme Court, citing support from trial courts in other jurisdictions, likewise concluded that the natural or prior adoptive parent's legal relationship to the child does not terminate when the child is adopted by the same-sex partner of the child's legal parent. See *Adoption of B.L.V.B.*, 160 Vt. 368, 374 (1993), citing *Matter of Evan*, 153 Misc. 2d 844 (N.Y. Sur. Ct. 1992).

two petitioners when the judge has found that joint adoption is in the subject child's best interests. We further conclude that, when a natural parent is a party to a joint adoption petition, that parent's legal relationship to the child does not terminate on entry of the adoption decree.

4. So much of the decree as allows the adoption of Tammy by both petitioners is affirmed. So much of the decree as provides in the alternative for the adoption of Tammy by Helen and the retention of rights of custody and visitation by Susan is vacated.

*So ordered.*

NOLAN, J. (dissenting). I write separately in dissent only because I do not agree with the sentiments expressed by my brother Lynch in the first few sentences of his dissent. His dissent is otherwise a faultless analysis of our existing jurisprudence to which I subscribe.

LYNCH, J. (dissenting, with whom O'Connor, J., joins). At the outset I wish to make clear that my views are not motivated by any disapproval of the two petitioners here or their life-style. The judge has found that the petitioners have provided the child with a healthy, happy, stable family unit. The evidence supports the judge's findings. Nor is my disagreement with the court related to the sexual orientation of the petitioners. I am firmly of the view that a litigant's expression of human sexuality ought not determine the outcome of litigation as long as it involves consenting adults and is not harmful to others. However, the court's decision, which is inconsistent with the statutory language, cannot be justified by a desire to achieve what is in the child's best interests. Indeed, those interests can be accommodated without doing violence to the statute by accepting the alternative to joint adoption suggested by the Probate Court judge (*ante* at 206 n.1); that is, permitting Helen to adopt Tammy while al-

lowing Susan to retain all her parental rights and obligations. This is essentially what the court accomplishes in part 2 (*ante* at 216) of its opinion. By this simple expedient, all of the court's concerns about protecting filial ties and avoiding legal limits are put to rest without invading the prerogatives of the Legislature and giving legal status to a relationship by judicial fiat that our elected representatives and the general public have, as yet, failed to endorse.

The court concludes that the Probate and Family Court has jurisdiction to grant a joint petition for adoption by two unmarried cohabitants because they meet the statutory requirements of G. L. c. 210, § 1, and it is in the child's best interests to be adopted by both. General Laws c. 210, § 1, enumerates who may petition for adoption.[1] In accordance with the statute, a petitioner of full age may petition to adopt. If a person is married and has a competent spouse, the spouse is required to join in the petition to adopt. See *Mitchell* v. *Mitchell*, 312 Mass. 154, 163 (1942); *Davis* v. *McGraw*, 206 Mass. 294, 298 (1910). If a husband and wife fail jointly to petition for adoption, a decree or judgment granting the adoption is void. *Lee* v. *Wood*, 279 Mass. 293, 295-296 (1932). A minor may petition for adoption of his or her natural child or may join in the petition of his or her spouse when the child is the natural child of one of the parties. G. L. c. 210, § 1. The court has also interpreted the statute as permitting a biological parent of full age to petition for the adoption of his or her own child. *Curran, petitioner*, 314 Mass. 91, 95 (1943). There is, however, nothing in the stat-

---

[1]General Laws c. 210, § 1 (1992 ed.), provides: "A person of full age may petition the probate court in the county where he resides for leave to adopt as his child another person younger than himself, unless such other person is his or her wife or husband, or brother, sister, uncle or aunt, of the whole or half blood. A minor may likewise petition, or join in the petition of his or her wife or husband, for the adoption of a natural child of one of the parties. If the petitioner has a husband or wife living, competent to join in the petition, such husband or wife shall join therein, and upon adoption the child shall in law be the child of both. If a person not an inhabitant of this commonwealth desires to adopt a child residing here, the petition may be made to the probate court where the child resides."

ute indicating a legislative intent to allow two or more unmarried persons jointly to petition for adoption.[2] Massachusetts became the first common law jurisdiction to authorize judicially approved adoption with parental consent by statute. St. 1851, c. 324. Presser, The Historical Background of the American Law of Adoption, 11 J. Fam. L. 443 (1972). General jurisdiction over adoptions is granted to the Probate and Family Court, G. L. c. 215, § 3, and can be exercised only as provided by the Legislature with the paramount concern, purpose, and focus of adoption proceedings being the welfare of the child. *Adoption of a Minor*, 386 Mass. 741, 743 (1982). See C.P. Kindregan & M.L. Inker, Family Law and Practice § 1851 (1990 & Supp. 1993). Since adoption is a creature of the Legislature, *Davis* v. *McGraw, supra* at 297, and in derogation of the common law, the statute must be strictly construed. See *Mitchell* v. *Mitchell*, 312 Mass. 154, 161 (1942); *Beloin* v. *Bullett*, 310 Mass. 206, 210 (1941); *Purinton* v. *Jamrock*, 195 Mass. 187, 197 (1907). The plain meaning of a statute cannot be expanded or altered where the Legislature establishes specific criteria or classifications to be satisfied. See *Holahan* v. *Medford*, 394 Mass. 186, 189 (1985); *Martinelli* v. *Burke*, 298 Mass. 390, 392 (1937). Unless one of the enumerated potential petitioners brings an adoption petition, the court lacks the jurisdiction to entertain the petition. *Mitchell* v. *Mitchell, supra* at 160-161. In the present case, the petitioners are two unmarried persons seeking to adopt a child. The statute only permits joint petitions · for adoption by married persons. See *Adoption of Meaux*, 417 So. 2d 522, 523 (La. Ct. App. 1982) (unmarried natural parents may not jointly adopt own illegitimate child); *Matter of Adams*, 189 Mich. App. 540, 544 (1991) (inconsistent with purpose and scope of adoption

[2]There is nothing based on sexual orientation in the statute which would prohibit a homosexual from singly adopting a child. Additionally, a parent may not be deprived of custody of his or her children simply because he or she is a homosexual. *Bezio* v. *Patenaude*, 381 Mass. 563, 579 (1980). Contra Fla. Stat. Ann. § 63.042 (1985) (prohibiting homosexuals from adopting); N.H. Rev. Stat. Ann. § 170-B:4 (1990) (same).

statute to allow joint adoption of two unmarried petitioners); *In re Jason C.*, 129 N.H. 762, 765 (1987) (two unmarried persons may not jointly adopt child). Contra *Adoption of B.L.V.B.*, 160 Vt. 368 (1993) (permitting joint petition to adopt by two unmarried persons).

The court opines that the use of the singular form "a person" in the first sentence of the statute should not be construed as prohibiting joint petitions by unmarried persons because such an interpretation would not be in the best interests of the child. I have already demonstrated that, whether the petition be singular or joint, has nothing to do with the best interests of the child. The court's reasoning in part 2 of its opinion amounts to a tacit agreement with this position. Furthermore, on examining § 1 as a whole, I find no inconsistent use of the singular form from the first sentence that "[a] person . . . may . . . adopt . . . another person younger than himself," to the final sentence pertaining to nonresidents who wish to adopt. Throughout the section, the singular is preserved. The only time a second petitioner is contemplated is where the initial petitioner has a living, competent spouse. There is nothing in the statute to suggest that joint petitions other than by spouses are permitted.

A biological mother may petition alone for the adoption of her child. *Curran, petitioner, supra.* Helen also meets the statutory requirements and may petition alone for the adoption of Tammy with Susan's consent.[3] G. L. c. 210, § 2. Despite the admirable parenting and thriving environment being provided by these two unmarried cohabitants for this child, the statute does not permit their joint petition for adoption of Tammy.

---

[3]The standard for involuntary termination of parental rights requires proof of neglect, abuse, or abandonment endangering the child, G. L. c. 119, § 24 (1992 ed.); otherwise, the parents must consent to the adoption, G. L. c. 210, §§ 2, 3 (1992 ed.). The biological father has signed an adoption surrender and affidavit supporting the adoption. G. L. c. 210, § 2. The mother has consented to the joint adoption petition.