2002 OK CIV APP 27

**In The Matter of The ADOPTION OF M.C.D.**

**James Robert Depew, Plaintiff/Appellant.**

v.

**Dawn Marie Depew, Defendant/Appellee.**

**No. 96099.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Oct. 26, 2001.

Certiorari Denied Jan. 23, 2002.

---

**38.** *Manhart v. Manhart,* see note 25, supra; *Duncan v. Duncan,* see note 26, supra; *Waller v.* *Waller,* see note 26, supra.

Brendan M. McHugh, Altus, OK, for Plaintiff/Appellant.

Lauren LeBlanc Day, Oklahoma·City, OK, for Defendant/Appellee.

KENNETH L. BUETTNER, Presiding Judge.

¶1 Plaintiff/Appellant James Robert Depew (Husband) appeals from the trial court's order which modified the divorce decree and also granted the adoption petitions of both Husband and his former wife, Defendant/Appellee Dawn Marie Depew (Wife), who were seeking to adopt M.C.D. Because we find the trial court erred in granting the adoption petitions of two unmarried persons seeking to adopt the same child, we reverse and remand for redetermination of the parties' adoption petitions. We affirm the trial court's orders regarding Husband's motion to modify the divorce decree.

¶2 This appeal involves both a motion to modify visitation in a divorce case and the parties' separate petitions to adopt M.C.D., the biological niece of Wife. M.C.D., born May 24, 1998, was placed in the parties' legal custody soon after her birth. Husband and Wife were divorced May 18, 1999. The divorce decree awarded custody of M.C.D., as well as the parties' daughter, C.D.M.D., to Husband. Wife was granted visitation rights. On September 14, 1999, Husband filed a motion to modify the divorce decree to restrict Wife's visitation rights, and also a petition to adopt M.C.D. Wife then filed her own petition to adopt M.C.D. February 9, 2000. Husband later sought an order relieving C.D.M.D. from abuse of parental authority by Wife.

¶3 The trial court consolidated these matters. After trial March 26 and 27, 2001, it entered orders granting both Husband's and Wife's petitions to adopt M.C.D. and denying Husband's petition to free C.D.M.D. from Wife's dominion for abuse of parental authority. The trial court modified the divorce decree (1) to require Wife to provide Husband with written progress reports documenting her appointments with her psychiatrist and showing she is complying with the psychiatrist's recommendations, (2) to pro-

hibit Wife from leaving the county with the children unless she provides prior notice to Husband of the destination and the length of stay, and (3) to increase Wife's child support obligation. Husband seeks review of these orders, asserting fourteen contentions of error.

## ISSUES RELATING TO THE MOTION TO MODIFY THE DIVORCE DECREE

¶4 Husband's first contention of error is that the trial court abused its discretion in denying his motion to modify and in reinstating the visitation provided in the divorce decree.[1] Although we reverse and remand on the adoption issue discussed below, we address the trial court's decision on the motion to modify because the custody and visitation issues were part of the divorce decree. The trial court's rulings on Husband's motion to modify custody and visitation as to C.D.M.D. will not be affected by remand of the decision on the adoption of M.C.D.

¶5 Husband argues the trial court should have modified the decree to provide supervised visitation with no overnight visits. Husband asserts that Wife sometimes has psychotic episodes associated with her bipolar disorder which are a threat to the children. He also argues Wife's visitation should be limited because she was allegedly willing to give up C.D.M.D. in exchange for custody of M.C.D. and because she allegedly caused C.D.M.D. to have post-traumatic stress disorder. We will not disturb a trial court's decision modifying terms of a custody order unless it is against the clear weight of the evidence. *Kahre v. Kahre*, 1995 OK 133, 916 P.2d 1355, 1360.

¶6 Wife admits she had psychotic episodes leading to her arrest and hospitalization, but argues the children were never hurt or endangered. She put on evidence that she was receiving successful treatment for her bipolar disorder, and was learning how to prevent the triggers for an episode and how to recognize the onset of an episode so that she can

---

1. Wife's visitation rights had been limited to supervised visitation, without overnight visits, in an emergency order filed in April 2000, based on

Wife's hospitalization following a psychotic episode.

get help before the problem worsens. She had had no episodes in the nine months prior to trial. Her psychiatrist testified that Wife had been "absolutely compliant" with her treatment, was high functioning, and could lead "a fairly normal life." He said bipolar disorder was similar to other chronic illnesses such as diabetes or lupus erythematosus in that the patient would be unable to care for children during brief exacerbations of the illness. However, he said "the vast percentage of the time [Wife] was more than capable of caring for children."

¶ 7 Husband argues Wife's psychiatrist's opinion is unreliable because Wife had a severe manic episode with psychotic features in April 2000, shortly after her psychiatrist wrote a letter in March 2000 stating "unequivocally that I do not have any reservations about [Wife's] capacity to provide stable and nurturing care for her niece." The psychiatrist opined that the March 2000 episode and a later one in June 2000 were precipitated by a lack of sleep. He said he could not predict that Wife would never have another manic episode, but Wife was now "infinitely more sensitive to the idea that sleep is a big predictor for her, and that if she begins to have difficulty with her sleep there's a greater level of sensitivity to be in touch with me."

¶ 8 Husband's expert witness, also a psychiatrist, stated Wife's psychiatrist's letter was "[p]robably a premature evaluation." She said the patient might be "fairly well-stabilized" but something led to the worsening of symptoms two weeks later. She said if she knew what happened during those two weeks, she would probably be able to figure out what triggered the episode. Husband's expert testified "mood lability[2] and anger and inability to modulate these emotions" in bipolar disorder is caused by an electrochemical abnormality in the frontal and temporal lobes of the brain and is treated by medications. She said it is a common occurrence for a doctor to spend two or three years figuring out which medications and dosages will keep a patient stable.

¶ 9 Husband argues C.D.M.D.'s clinical counselor diagnosed C.D.M.D. as having post-traumatic stress disorder as a result of an incident when Wife had a manic episode and drove off from a gas station, leaving Husband and the two children there. The counselor testified post-traumatic stress is usually caused by actual harm or threat but could be caused by a perceived threat. She said C.D.M.D. "would probably be on the lower end" of the post-traumatic stress scale. The counselor said C.D.M.D. identified the gas station incident as the event that traumatized her. However, the counselor said C.D.M.D. was unable to relate the story "in the 'I,' where she starts every sentence with 'I,' 'I experienced this, this is happened to me.' " Therefore the counselor was concerned as to whether C.D.M.D.'s memory of the event was hers or what others had told her. The counselor said C.D.M.D. was at the gas station by herself when Husband left to pick up Wife.

¶ 10 Husband also argues Wife should not have overnight visitation because she had offered to give up C.D.M.D. for custody of M.C.D. Wife disputed Husband's characterization of the incident, and even Husband's expert suggested Wife's motive might have been to protect the child from "being injured by the back and forth."

¶ 11 Based on this record, the trial court could conclude Wife had achieved stabilization of her bipolar disorder and was capable of caring for the children. It could infer that C.D.M.D.'s traumatization from the gas station incident was caused or contributed to by Husband's handling of the situation instead of or in conjunction with Wife's behavior. Wife's witnesses testified Wife had a loving and healthy relationship with the children. From our review of the record, we are unable to state the trial court's order denying Husband's motion to modify visitation is against the clear weight of the evidence.

2. "Lability" is the state or quality of being labile. " 'Labile' is that which is characterized by a ready tendency toward or capability for change: CHANGEABLE, UNSTABLE <an emotionally patient>." Webster's Third New Intnl. Dictionary, Unabridged (1986). Also, "labile: ... 4. In psychology or psychiatry, denoting free and uncontrolled expression of the emotion." Stedman's Medical Dictionary, 25th Ed. (1990).

ADOPTION ISSUES

¶ 12 Husband's second contention is the trial court erred as a matter of law by ordering a joint adoption by two unmarried people. The Oklahoma Adoption Code, 10 O.S.Supp. 1998 § 7503–1.1, provides:

The following persons are eligible to adopt a child:

1. A husband and wife jointly if both spouses are at least twenty-one (21) years of age;

2. Either the husband or wife if the other spouse is a parent or a relative of the child;

3. An unmarried person who is at least twenty-one (21) years of age; or

4. A married person at least twenty-one (21) years of age who is legally separated from the other spouse.

Husband argues Subsection 3 uses the word "person" in the singular and therefore allows only one unmarried person to adopt a child. Wife argues the statutory language does not specify one way or the other whether two formerly married persons may jointly adopt the niece. She contends the language is more easily construed as allowing rather than prohibiting the adoption because both Wife and Husband qualify under Subsection 3 and the statute does not say one and only one unmarried person may adopt a child. Wife argues the statute should be construed in light of the Legislature's statement of purpose:

The Legislature of this state believes that every child should be raised in a secure, loving home and finds that adoption is the best way to provide a permanent family for a child whose biological parents are not able or willing to provide for the child's care. . . . The purpose of the Oklahoma Adoption Code is to:

1. Ensure and promote the best interests of the child in adoptions . . . ;

2. Affirm that the parent-child relationship is fundamental and that all adoption laws should be fair to the child and to each parent of the child;

. . .

8. Ensure that children placed for adoption will be raised in stable, permanent loving families whose qualifications for adoption have been properly evaluated in light of the child's needs; . . .

10 O.S.Supp.1997 § 7501–1.2 (A).

■ ¶ 13 The question whether more than one unmarried person may adopt the same child(ren) has not been decided in Oklahoma. Other states have reached conflicting results when faced with the question. Almost all courts agree that adoption is a purely statutory procedure and that adoption statutes must therefore be strictly construed. See *In re Adoption of C.C.G. and Z.C.G.*, 762 A.2d 724, 727 (Pa.Super.2000); *Adoption of Carl*, 184 Misc.2d 646, 649, 709 N.Y.S.2d 905, 907 (2000); *Adoption of Tammy*, 416 Mass. 205, 619 N.E.2d 315, 317–318 (Mass.1993); *Matter of Adoption of V.A.J.*, 1983 OK 23, 660 P.2d 139, 141; contra *Adoption of B.L.V.B.*, 160 Vt. 368, 628 A.2d 1271, 1273 (1993) (application of statutes should implement their purpose and the court must avoid results that are irrational, unreasonable or absurd by looking not only at the letter of the law but also its reason and spirit).

¶ 14 Although other states' statutes addressing eligibility to adopt are not identical to ours, most are similar in that they mention joint adoption only in the case of married adopters but also provide for adoption by a single adult. Courts have therefore been faced with the precise issue we face, which is whether the statutory provision for a single person of a certain age being eligible to adopt can be applied to more than one potential adopter of the same child(ren) while following the dictate that such statutes be "strictly construed."

¶ 15 In *Adoption of Meaux*, 417 So.2d 522 (La.App.1982), an unmarried man and woman who were the natural parents of the child sought to adopt the child. The trial court had rejected their petition, finding "(father) and (mother), both single individuals petitioning jointly, are not persons who may petition for adoption" under the applicable statute. That statute provided that "a single person eighteen years or older, or a married couple jointly, may petition to adopt a child." The

Louisiana Court of Appeals, in affirming the trial court, stated that under the plain language of the statute, the mother and father were not a "single person" nor were they a married couple. *Id.* at 523. See also *Matter of Adams*, 189 Mich.App. 540, 473 N.W.2d 712 (1991) (unmarried natural parents of adult daughter, along with each parents' spouse, could not adopt the adult daughter, based on statutory limits on eligibility to adopt).

¶ 16 Likewise, in *Adoption of C.C.G. and Z.C.G.*, *supra*, 762 A.2d at 724, one of the men in a long-term domestic partnership adopted two children. Later, both men filed a petition seeking to have the children adopted by the other man, without terminating the parental rights of the first adoptive father. The trial court denied that petition and the two men appealed. The appellate court stated at the outset that its decision was not based in any way on the parties' sexual orientation. *Id.* at 727. Accordingly, the court's reasoning cannot be distinguished from the facts of the instant case on that basis. The court explained that its decision was based simply on statutory construction. The court noted that adoption statutes must be strictly construed and stated, specifically, "(o)ur courts cannot and should not create judicial exceptions where the legislature has not seen fit to create such exception." *Id.*, citing *Adoption of K.M.W.*, 718 A.2d 332, 333 (Pa.Super.1998). The court noted that, although the "second father" fit the statutory definition of a single person ("any individual") seeking to adopt, another part of the Pennsylvania Adoption Act provides that before an adoption may be entered, a surviving parent must file a consent for the child to be adopted which indicates that parent's intent to permanently relinquish all parental rights. *Id.* The court noted that the "first father" had filed a consent to adopt, but had omitted the phrase indicating his intent to give up his own parental rights. The court noted that the only exception to that relinquishment requirement is where a person consents to his children being adopted by his spouse. The court noted that the two men were not

spouses so that the exception could not apply to them. The court also noted its earlier opinion in *Adoption of K.M.W.*, *supra*, that a maternal grandmother could not adopt her grandchild while the child's mother retained her parental rights in the child. The court concluded by noting that the Pennsylvania Adoption Act prevented it from making a best interests analysis until after it had determined that the bare statutory requirements for eligibility had been met. *Id.* at 729. For these reasons, the Pennsylvania Superior Court determined that two unmarried persons could not jointly adopt a child. *Id.*

¶ 17 Courts in New York, Vermont, and Massachusetts have reached the opposite result. In *Adoption of Tammy*, *supra*, 619 N.E.2d at 315, the petitioners were two women. One was the biological mother of Tammy and the other was the mother's domestic partner. The two women sought to jointly adopt Tammy. The court detailed the couple's long history together and their success at raising the child as part of an intact family unit headed by two Harvard Medical School professors and aided by a full-time nanny.

¶ 18 The court began its analysis by stating "despite the overwhelming support for the joint adoption and the judge's conclusion that joint adoption is clearly in Tammy's best interests, the question remains whether there is anything in the law of the Commonwealth which would prevent this adoption." *Id.* at 317. The court then noted that adoption laws must be strictly construed and explained that where the statutes are ambiguous, they should be construed to enhance their stated purpose, which in the case of the adoption laws, is to further the child's best interests. *Id.* at 318. The court noted that the Massachusetts statute on eligibility to adopt provides that "a person of full age may petition ... for leave to adopt ..."[3] The statute requires that if the petitioner is married the spouse must join the petition. The court then opined that "the statute does not expressly prohibit or require joinder by any person." *Id.* The court also indicated that although the statute uses the singular "a

---

**3.** The statute is limited by the provision that the person to be adopted must be younger than the adopter and that the person to be adopted may

not be the adopter's "wife, or husband, or brother, sister, uncle or aunt, of the whole or half blood." *Id.*

person," there is, in Massachusetts, a legislatively mandated rule that "words importing the singular may extend and be applied to several persons" unless the result is inconsistent with legislative intent. *Id.* at 319. The court then held:

> In the context of adoption, where the legislative intent to promote the best interests of the child is evidenced throughout the governing statute, and the adoption of a child by two unmarried individuals accomplishes that goal, construing the term "person" as "persons" clearly enhances, rather than defeats, the purpose of the statute.

¶ 19 *Id.* The court also noted the prohibitions on who may adopt (see note 2) and found that the legislature did not include a prohibition on adoption by two unmarried persons "like the petitioners." *Id.* The court concluded that the legislature did not attempt to define all possible categories of persons who might adopt. The court in *Tammy* therefore affirmed the joint adoption by the two women based on its finding that both women fit the statutory definition of "a person." [4]

¶ 20 Interestingly, the court included a footnote explaining that children have often been adopted into "non-standard" families. *Id.* n. 4. One of the cases cited in that footnote, however, involved the case of two boys whose natural parents had died. *Merrill v. Berlin*, 316 Mass. 87, 89, 54 N.E.2d 674 (1944). In that case, the mother's will had indicated her desire that the children be raised by the mother's aunt and her two female cousins. The grandparents petitioned for adoption which was granted. The three female guardians appealed and the appellate court reversed, finding that, although the guardians' home was "wholly feminine" there was no good reason to go around the mother's testamentary wishes. What is interesting is that there is no mention in the opinion

of the possibility of the three guardians adopting the children. Rather, the court implicitly left the boys as legal orphans rather than purport to give them three adoptive parents. The court in *Tammy*, went to great lengths to support a liberal construction of the statutory phrase "a person" in order to facilitate an adoption that it believed was in Tammy's best interests, while ignoring the problem that, if "person" can be construed as plural, nothing prevents courts from allowing an adoption by more than two people, such as the three guardians in *Merrill.*

¶ 21 In *Adoption of Carl, supra,* 709 N.Y.S.2d at 905, two unmarried adults who had lived together for 24 years sought to adopt a child who was placed with the couple as a foster child when he was only a few days old. The child's natural mother had relinquished her rights to the child shortly after his birth. The court noted that the question before it was whether two unmarried adults may jointly adopt a child who is not the natural child of either of the adults. *Id.* at 907. The court quoted the New York statute which provided "an unmarried adult person or an adult husband and his adult wife together may adopt another person.... No person shall hereafter be adopted except in pursuance of this article * * *." *Id.* The court based its decision to allow the couple to jointly adopt the child on its finding that the statute does not expressly prohibit such an adoption and on its finding that "both petitioners are willing and able to assume the duties of parenthood with respect to Carl and to provide him with a stable and permanent home ..." *Id.* at 909–910. It is evident that in *Adoption of Carl,* the couple's long term cohabitation provided indicia of a "stable and permanent home" which supported the court's loose reading of the eligibility statute.

¶ 22 We do not intend to imply that cohabitation alone would lead this court also to stray from a strict construction of our eligi-

---

4. The court had earlier indicated that in Massachusetts a natural parent may adopt his or her own child. The court avoided the implications of the statute providing that upon adoption by another, the natural parent relinquishes all parental rights simply by stating that the "Legislature obviously did not intend that a natural parent's legal relationship to its child be terminated when the natural parent is a party to the adoption petition." *Id.* at 321. The court in *Adoption of B.L.V.B.,* supra, similarly inferred legislative intent to allow a natural parent's domestic partner to adopt the children without suffering the effects of statutes requiring relinquishment of the natural parent's rights. 628 A.2d at 1274. We discuss the Oklahoma law on this issue later in this opinion.

bility statute. Indeed, in the instant case, the objectives of the adoption statutes: permanence and stability in the family, are completely absent. We note the factually similar case of *In re Jason C.*, 129 N.H. 762, 533 A.2d 32, in which two foster parents divorced and then later sought to jointly adopt the foster child. In *Jason C.*, the couple was married at the time they became foster parents. Their subsequent divorce decree granted custody to the wife and ordered the husband to pay child support. Several months after the divorce, the wife filed a petition to adopt the child and the husband later sought to be joined as a co-petitioner. *Id.* at 33. The trial court denied the husband's request and granted the wife's adoption petition. On appeal, the husband urged that the language in the adoption eligibility statute that "an unmarried adult" may adopt should not be limited in application to only one adult. *Id.* The husband relied on a stated purpose of the statute to "facilitate adoption by removing 'arbitrary and broad restrictions' on who could adopt. . . ." *Id.* The appellate court detailed the statutory categories of who may adopt and found that applicants meeting those categories shared a common characteristic:

> their domestic circumstances do not threaten to disrupt the living arrangements they will provide for the child to be adopted. Married applicants who apply jointly demonstrate a sense of common purpose. The unmarried applicant who applies alone presents a household with no apparent risk of splitting up. The married applicant who is separated from a spouse by desertion or legal decree may be in the same practical position as someone who is legally single.

We may infer, then, that it was the legislature's intent to confine adoption to applicants who will probably provide a unified and stable household for the child. This objective is not likely to be served by authorizing two unmarried applicants to adopt jointly, . . . The applicants do not share living quarters, and if the court were to entertain and grant their joint petition, . . . it would have to make a custody determination . . . The statute evidently assumes that the child will have one 'home,' . . .

*Id.* at 33–34. The court accordingly affirmed the denial of the husband's petition to jointly adopt. *Id.*

¶ 23 We agree with the court's rationale. The requested adoption by two divorcing persons fails to fit within any of the statutory categories of those eligible to adopt. It contravenes the above-stated purpose of the Oklahoma Adoption Act that children should be placed in stable, permanent loving families. The "family" in the instant case is divided by divorce and Husband and Wife clearly have an antagonistic and adversarial relationship. It is therefore not stable, permanent or loving as a family "unit," despite how stable or loving Husband and Wife may be individually.[5]

¶ 24 In addition, Wife's interpretation of the "unmarried person" provision of § 7503–1.1 to allow multiple petitions would mean, when extended, that the Legislature intended to allow an unlimited number of adoptive parents, of either sex. This intent is negatived by the other subsections of the statute and by other provisions of Oklahoma's adoption laws.[6] It is up to the Legislature to

---

5. There was testimony of the negative effects on children caused by divorce. It makes little sense to intentionally insert a child into such a relationship where a court has to decide issues of custody, visitation, and support.

6. We note that the Adoption Act provides that "after a final decree of adoption is entered, the biological parents of the adopted child, unless they are the adoptive parents or the spouse of an adoptive parent, shall be relieved of all parental responsibilities for said child and shall have no rights over the adopted child or to the property of the child by descent and distribution." 10 O.S. Supp.1997 § 7505–6.5 (B). Oklahoma

cases have also long held that the effect of a final decree of adoption is termination of the natural parents' rights. See *Wade v. Brown*, 1973 OK 137, 516 P.2d 526, 529, *Mahan v. Moore*, 1946 OK 352, 175 P.2d 345, 348, 198 Okla. 67; *Allison v. Bryan*, 109 P. 934, 937, 26 Okla. 520 (1910). This law supports our decision that there may be only one legal parent (either a married couple or a single individual meeting the provisions of § 7503–1.1) at any time and that, in order to enter an adoption decree in favor of another adult meeting the § 7503–1.1 criteria, the prior parent's rights are *de facto* terminated. For example, see *In re Estate of Moore*, 2001 OK CIV APP 76, 25 P.3d 305, which discusses the

determine to change the Adoption Act if it decides that multiple unmarried persons, not living together in a family unit, should be eligible to adopt the same child(ren). We are bound to follow the dictates of the Adoption Act as it now exists. Strict construction of the statute requires that we reverse the order granting both petitions to adopt. We remand this case for redetermination of the petitions to adopt.

¶ 25 Husband's third contention of error is the trial court abused its discretion in allowing Wife to adopt M.C.D. Husband's sixth contention of error is the trial court abused its discretion by permitting evidence and giving undue weight to testimony regarding the blood relationship between M.C.D. and Wife. He argues their blood relationship was irrelevant because it is not listed as a factor under the purposes of the Adoption Code, 10 O.S.Supp.1997 § 7502–1.2. Husband's twelfth contention of error is the trial court abused its discretion in waiving the interlocutory waiting period for adoption as provided by 10 O.S.Supp.1998 § 7505–6.3. However, because we remand for redetermination of the petitions to adopt, we do not reach these issues.

## ABUSE OF PARENTAL AUTHORITY

█ ¶ 26 Husband's fourth contention of error is the trial court abused its discretion in denying his "petition for abuse of parental authority." He sought to free C.D.M.D. from Wife's dominion, while enforcing the duty of support and education, on the grounds Wife abused her parental authority pursuant to 10 O.S.1991 § 9. As Husband's brief notes, case law applying § 9 is sparse. We are unable to find any appellate opinions approving an order freeing a child from its parent's dominion. However, in *Lively v. Lively*, 1993 OK CIV APP 62, 853 P.2d 787, 790, the court found allegations that the wife had minimal contact with the child, had voluntarily left the child with its grandparents, did not advise the grandparents of her whereabouts, and had mistreated and improperly cared for the child, were sufficient

to raise the issue of whether the wife had abused her parental authority. Conversely, in *Maupin v. Hasty*, 2000 OK CIV APP 16, 996 P.2d 468, 470, the court stated it could not agree that failure to furnish child support or to reintegrate into the child's life after an order prohibiting contact constituted an abuse of parental authority.

¶ 27 The facts Husband argues show abuse of parental authority are that Wife cursed at C.D.M.D. and chased her around the house, "left her biological child at a gas station for two and an half hours," and was "willing to swap her natural child for the child sought to be adopted." According to Wife, the chasing and cursing incident occurred when she came to pick up C.D.M.D. for visitation and C.D.M.D. did not want to go with her. Wife said Husband told her he was a neutral bystander and if Wife wanted C.D.M.D. to go with her, Wife had to make C.D.M.D. go. Wife said she ended up chasing C.D.M.D., but admitted "it was the wrong response." These three incidents are inadequate to establish that Wife abused her parental authority. The trial court's order denying Husband's motion to free C.D.M.D. from Wife's dominion is neither against the clear weight of the evidence nor an abuse of discretion.

## EVIDENTIARY ISSUES

█ ¶ 28 Husband's next contentions of error relate to the trial court's rulings on evidentiary matters. We review a trial court's decision on the admission of evidence for an abuse of discretion. *Holm–Waddle v. Hawley*, 1998 OK 53, 967 P.2d 1180, 1182. We will not find an abuse of discretion unless the trial court "made a clearly erroneous conclusion and judgment, against reason and evidence." *Broadwater v. Courtney*, 1991 OK 39, 809 P.2d 1310, 1312.

█ ¶ 29 Husband contends the trial court abused its discretion by allowing Husband's own expert witness to testify beyond her expertise and beyond the scope of direct examination. He argues his expert should

principle that a second paternal adoption terminates the relationship of the first adoptive father. This suggests that a child may only have one adoptive mother and one adoptive father at any

one time. This further suggests that the "unmarried person" provision of § 7503–1.1 cannot be used to support multiple single person adoptions.

have been limited to testifying about bipolar disorder and not allowed to render an opinion regarding allowing adoption, terminating parental rights, or the effects of Wife/child bonds. At trial, the expert testified she was a psychiatrist. Wife then stipulated to Husband's expert's qualifications without objection by Husband. Husband has not demonstrated that his expert testified outside her expertise.

¶ 30 On direct examination, Husband's counsel elicited testimony from the expert regarding the impact on a child's psyche of being raised by a parent with bipolar disorder. Husband did not object when M.C.D.'s attorney asked on cross-examination if it could be in the best interest of a child to allow a bipolar person to adopt the child. On Wife's recross-examination, her counsel asked if the expert would be more likely to favor an adoption if the bipolar person had raised the child and the child knew her. Husband objected as outside the scope of direct and the trial court overruled the objection. Husband's expert then testified very favorably to Wife, opining that M.C.D. would be so severely damaged from being separated from Wife that it was "scary." The expert lamented the tragedy that occurs in divorce when an immature parent tries to use a child to hurt the other parent and ends up hurting and confusing the child.

¶ 31 Cross-examination is available to develop relevant truth related to matters covered on direct examination and to impeach the veracity or credibility of a witness. *Arkansas Louisiana Gas Co. v. Bass,* 1985 OK CIV APP 1, 698 P.2d 947, 949. Wife's question properly served to accomplish the former; in particular, it developed relevant truth as to whether Wife should be allowed to adopt M.C.D. in light of Wife's bipolar disorder, a subject raised by Husband on direct examination of his expert witness. The trial court did not abuse its discretion by allowing the expert witness to answer the question.

¶ 32 Husband's next contention of error is the trial court abused its discretion in allowing Wife's attorney to inquire and refer to her as "a good Christian woman." He cites *Hoedebeck v. Hoedebeck,* 1997 OK CIV APP 69, 948 P.2d 1240, as holding a parent's religious beliefs are irrelevant in child custody matters unless associated activities are harmful to the child. However, *Hoedebeck* does not prohibit any mention of religious matters. Husband fails to show a substantial right was affected by the reference to Wife as "a good Christian woman." Therefore, we find no reversible error. 12 O.S.1991 § 2104 (A).

¶ 33 Husband's next contention of error is the trial court abused its discretion by refusing to hear testimony from C.D.M.D. under the child preference statute or in the alternative appointing a guardian ad litem for C.D.M.D. The child preference statute, 43 O.S.1991 § 113, provides:

> The court may determine whether the best interest of the child will be served by the child's expression of preference as to which parent should have custody or limits of or period of visitation rights of either parent. If the court so finds, the child may express such preference or give other testimony.

Based on the testimony of C.D.M.D.'s counselor, the trial court could infer that C.D.M.D., if called to testify, would say what she thought Husband wanted her to say instead of independently testifying. Therefore, the trial court did not abuse its discretion in declining to hear C.D.M.D.'s expression of preference as to the limits or period of Wife's visitation rights.

¶ 34 Husband argues in the alternative the trial court should have appointed a guardian ad litem or independent counsel for C.D.M.D. because this case was similar to a termination of parental rights proceeding and he alleged Wife abused C.D.M.D. Husband did not raise this issue below, but in his tenth contention of error, he argues the trial court committed fundamental error by not appointing an attorney for C.D.M.D. Failure to appoint an attorney for a child is fundamental error in any proceeding that results in termination of parental rights. *In Re Adoption of K.D.K.,* 1997 OK 69, 940 P.2d 216, 217–218. A court may not terminate parental rights pursuant to *10 O.S.1991 § 9. Maupin v. Hasty,* 2000 OK CIV APP 16, 996 P.2d 468, 470. Therefore, the trial court's

failure to appoint an attorney for C.D.M.D. in this proceeding is not fundamental error. We will not otherwise consider issues not presented to and passed upon by the trial court. *Von Stilli v. Young*, 1950 OK 137, 203 Okla. 86, 219 P.2d 224.

¶ 35 Husband's ninth contention of error is that the trial court abused its discretion in refusing to allow C.D.M.D. to testify as a rebuttal witness. Husband argues C.D.M.D. was a proper rebuttal witness because of her "age, intelligence, maturity," and "because her interests were at stake." As we pointed out in Part VIII above, the testimony of C.D.M.D.'s counselor raised questions about C.D.M.D.'s ability to testify independently. Therefore, the trial court did not abuse its discretion in refusing to allow C.D.M.D. to testify as a rebuttal witness.

## REMAINING ISSUES

¶ 36 Husband's next contention is the trial court erred as a matter of law in not making child support effective upon the date of filing the motion to modify. The child support guidelines provide:

"An order of modification shall be effective upon the date the motion to modify was filed, unless the parties agree to the contrary or the court makes a specific finding of fact that the material change of circumstance did not occur until a later date."

43 O.S.Supp.2000 § 118 (E)(16)(a)(4). The trial court made the modification of child support effective the first of the month following trial. It did not make a specific finding of fact as to when the material change of circumstance occurred, and the parties made no agreement as to the effective date of the modification. Therefore, the trial court erred as a matter of law in not making child support effective upon the date of filing the motion to modify.

¶ 37 Husband's thirteenth contention of error is that the trial court abused its discretion in awarding the tax exemption for C.D.M.D. to Wife. The IRS Code presumes that the exemption for a dependent child will be taken by the custodial parent. 26 USCA § 152(e)(1); *Hughes v. Hughes*, 518 N.E.2d 1213, 1216, 35 Ohio St.3d 165,

cert. denied 488 U.S. 846, 109 S.Ct. 124, 102 L.Ed.2d 97 (1988). Section 152 provides that a child who receives over half of her support from her parent in the tax year may be claimed as a dependent by that parent. The section further provides that in the case of divorced parents, the custodial parent is considered to have provided over half the child's support and may therefore claim the exemption, unless the custodial parent has released his or her claim to the exemption by signing a written declaration that the custodial parent will not claim the exemption for that tax year and the noncustodial parent attaches the declaration to his or her tax return. 26 USCA § 152(e)(1)(B) and (e)(2). Nevertheless, state trial courts retain their equitable power to award the dependent exemption to either parent regardless of § 152(e). *Hughes, supra; Monterey County v. Cornejo*, 812 P.2d 586, 283 Cal.Rptr. 405, 53 Cal.3d 1271 (Cal.1991). This court has also held that a trial court has authority to allocate the dependent exemption and authority to order the custodial parent to sign the written declaration disclaiming the right to the exemption if the trial court finds that the noncustodial parent should claim the exemption. *Wilson v. Wilson*, 1991 OK CIV APP 79, 831 P.2d 1, 2; accord, *Light v. Light*, 1992 OK CIV APP 11, 828 P.2d 447, 448.

¶ 38 Section 152(e) is an exception to the rule that the taxpayer who provides over half the child's support is entitled to claim the dependent deduction. That exception is that a custodial parent is "treated" as having provided over half the child's support. 26 USCA § 152(e)(1)(B). Clearly, this language indicates that the custodial parent need not have provided over half the support in fact. Rather, it is presumed the custodial parent may claim the exemption unless such parent executes the disclaimer of the exemption. In the instant case, the child support computation shows Husband's monthly gross income was $3,197.27 and Wife's was $3,342.76. Under the guidelines, Husband's share of the children's support is $548.02 per month and Wife's is $574.98. The trial court granted the exemption for C.D.M.D. to Wife and the exemption for M.C.D. to Husband. It appears therefore that the trial court was sim-

ply splitting the exemptions between Husband and Wife. Although the award of the exemption for C.D.M.D. to Wife is not against the clear weight of the evidence, the trial court's decision on this issue may change following remand on the adoption issue, because at that time there will be only one exemption (for C.D.M.D.) to award as part of the divorce decree. We therefore do not issue a final decision on this issue.

¶ 39 Husband's last contention of error is that the trial court abused its discretion "in disallowing adverse inference and failing to sanction [Wife] for not complying with the previous Supreme Court order." In Case No. 95,312, the Oklahoma Supreme Court issued a writ directing the trial court to compel Wife to produce her physical and mental health records for the trial court's *in camera* inspection.[7] The trial court was then to disclose any relevant information to Husband only under an appropriate protective order. On remand, the trial court issued a court minute [8] directing Wife to provide specified records to the court by January 1, 2001.

¶ 40 Husband argues he is entitled to an adverse inference as a sanction against Wife because she failed to produce records from mental health services she received after January 1, 2001. We are unable to find any order in the record requiring Wife to produce such records. Accordingly, we find no abuse of discretion by the trial court.

## CONCLUSION

¶ 41 For the foregoing reasons, the trial court's order modifying child support is modified to make its effective date August 18, 2000, the date Husband filed his motion to modify support. The order granting both Husband's and Wife's petitions to adopt M.C.D. are reversed and remanded for redetermination. The requests of both Wife and Husband for attorney fees on appeal are denied.

¶ 42 AFFIRMED IN PART/REVERSED IN PART AND REMANDED.

¶ 43 GARRETT, J., concurs.

¶ 44 HANSEN, C.J., dissents with separate opinion.

CAROL M. HANSEN, C.J., dissenting:

¶ 1 The majority's opinion takes a four-year-old child away from the only mother she has ever known. The law does not require this result.

¶ 2 The majority acknowledges the language of 10 O.S.Supp.1998 § 7503–1.1 is subject to conflicting interpretations, yet characterizes its chosen interpretation as "strict construction." Under a strict construction standard, however, in order to support the majority's interpretation, the statute would have to provide one and only one unmarried person may adopt a child. It does not so state; instead, Subsection 3 grants eligibility to both Wife and Husband. Therefore, the statute does not prevent the trial court from

---

7. According to the OCIS case report, the Supreme Court's journal entry stated,

LET WRIT ISSUE COMMANDING RESPNDT JUDGE, ETC, TO COMPEL REAL PARTY I/INTEREST TO PRODUCE FOR INCAMERA [sic] INSPECTION ANY & ALL RECORDS, ETC, RELATING TO HER PHYSICAL & MENTAL HEALTH SINCE TH/BIRTH OF HER MINOR CHILD; PURPOSE OF INSPECTION IS TO DETERMINE WH/INFO IF ANY IS PERTINENT TO EITHER OF THE UNDERLYING PROCEEDINGS, WH H/BEEN CONSOLIDATED UNDER FD99126 ON DOCKET OF DC JACKSON CO; DISCLOSURE TO PETNR OF ANY SUCH RELEVANT INFO AS MAY BE PRODUCED SH/ONLY BE PERMITTED SUBJECT TO APPROPRIATE [sic] PROTECTIVE ORDER WH/RESPNDT OR ASSIGNED JUDGE SH/ISSUE TO MAINTAIN CONFIDENTIALITY.

8. The trial court's minute of December 11, 2000, stated,

MATTER COMES ON FOR HEARING REGARDING REMAND FROM OKLAHOMA SUPREME COURT; BY AGREEMENT, DEFENDANT IS TO OBTAIN MEDICAL RECORDS OF DEFENDANT SINCE BIRTH OF MINOR CHILD FROM TAILEFERRO [sic] MENTAL HEALTH, TREATING PHYSICIAN, DR. HARVEY MARTIN, and RED RIVER HOSPITAL IN WICHITA FALLS, and JCMH MENTAL HEALTH CLINIC IN ALTUS; ALL AT PLAINTIFF'S EXPENSE, WITH PLAINTIFF ENTITLED TO RESERVE RE ALLOCATION OF SUCH EXPENSE AT FINAL HEREIN.
DEFENDANT TO PROVIDE RECORDS THROUGH ATTORNEY LEVERETT, WITH ATTORNEY LEVERETT TO TURN OVER ALL RECORDS TO THE COURT. ALL TO BE DONE ON OR BEFORE JANUARY 1, 2001.

allowing both Wife and Husband to adopt M.C.D.

¶ 3 The majority argues the Adoption Code's objectives of permanence and stability in the family are absent in this case. I strongly disagree. M.C.D. and C.D.M.D. have been raised as sisters. Wife is the only mother M.C.D. has ever known. If Wife is not allowed to adopt M.C.D., C.D.M.D. will have a mother while M.C.D. will not, and M.C.D. will be excluded from C.D.M.D.'s visitations with Wife. Under the unique facts of this case, the purposes of the Oklahoma Adoption Code are best met by allowing both divorced parents to adopt the child who has been in their legal custody since she was an infant. Although the parties' divorce is a factor diminishing the stability of the family, in this case stability and fairness for M.C.D. means allowing her to continue being C.D.M.D.'s full sister and enjoying the same relationship with both parents that C.D.M.D. will experience.

¶ 4 In a footnote, the majority cites testimony in the record of the negative effects on children caused by divorce, and opines the Court should not "intentionally insert a child into such a relationship." This testimony, provided by Husband's expert witness, actually relates to the negative effect of **separation** from a parent, not of divorce. The expert opined M.C.D. would be so severely damaged from being separated from Wife that it was "scary." The majority's opinion effectively **guarantees** this damage, instead of protecting against it.

¶ 5 The majority reverses and remands the trial court's order to the extent it granted both Husband's and Wife's adoption petitions. However, Wife did not oppose Husband's adoption petition and did not appeal the order granting it. I would hold the trial court did not err as a matter of law in allowing the adoption by both Wife and Husband.

¶ 6 I concur in the remainder of the majority's opinion.

