818 N.E.2d 126 (2004)
In re the Parentage of A.B.,
Dawn King on her own behalf and as next friend of A.B., a minor, Appellant-Petitioner,
v.
S.B., Appellee-Respondent.
No. 53A01-0407-JV-284.
Court of Appeals of Indiana.
November 24, 2004.
*127 Sean C. Lemieux, Fishers, IN, Attorney for Appellant.
Kendra Gowdy Gjerdingen, Andrew C. Mallor, Mallor Clendening Grodner & Bohrer, LLP, Bloomington, IN, Attorneys for Appellee.

OPINION
FRIEDLANDER, Judge.
Dawn King, on her own behalf and as next friend of A.B., a minor, initiated the instant declaratory judgment action against A.B.'s biological mother, Stephanie Benham, seeking to establish her (Dawn's) co-parentage of A.B., a child conceived by artificial insemination during Dawn and Stephanie's intimate domestic relationship. Dawn appeals the trial court's dismissal of her complaint for failure to state a claim upon which relief may be granted.
We reverse and remand.
The complaint reveals the following relevant facts. Dawn and Stephanie shared their home and their lives for nearly nine years, beginning in 1993. During their relationship, the couple shared joint finances and held themselves out to their families, friends, and community as a couple in a committed, loving relationship. Dawn and Stephanie even participated in a commitment ceremony at which they proclaimed themselves to be committed domestic partners before family and friends.
*128 After several years together, the couple jointly decided to bear and raise a child together. They mutually determined that Stephanie would be impregnated by artificial insemination and that Dawn's brother would be the semen donor. Stephanie suggested using Dawn's brother as the semen donor because she wanted both herself and Dawn to be genetically related to the child. Dawn's brother agreed to be the semen donor. All parties involved (Dawn, Stephanie, and the brother) intended for Dawn and Stephanie to be co-parents of the resulting child, assuming equal parental roles in the child's care and support. Stephanie was artificially inseminated with semen donated by Dawn's brother in August 1998, and A.B. was born on May 15, 1999. Dawn was present for and participated in A.B.'s birth. Further, all expenses associated with the pregnancy and birth that were not covered by insurance were paid from the couple's joint bank account.
At some point following A.B.'s birth, Dawn, with Stephanie's consent, filed a co-parent petition to adopt A.B. While the adoption was pending, the parties separated for approximately three months, and Stephanie withdrew her consent to the adoption. During this brief period of separation, Dawn paid child support for A.B.'s benefit and enjoyed regular visitation. For reasons not apparent in the record, the adoption was not pursued any further after Dawn and Stephanie reconciled and resumed living together as a family. The relationship between Dawn and Stephanie eventually ended in January 2002. Thereafter, Dawn paid monthly child support and continued to have regular and liberal visitation with A.B. until late July 2003. At that point, Stephanie unilaterally terminated visitation and began rejecting Dawn's support payments.
From A.B.'s birth until July 2003, Dawn and Stephanie acted as co-parents, with important decisions concerning A.B. being determined by them in concert. Dawn has cared for A.B. as a parent, feeding and bathing her, attending doctor's appointments, providing health insurance coverage, and generally providing the financial and emotional support of a parent. She held A.B. out to family, friends, and the community as her daughter. Stephanie consented to and encouraged the formation of a parent-child relationship between Dawn and A.B. Dawn and A.B. have established a bonded, dependent parent-child relationship, and A.B. knows Dawn as her mother in the same manner that she knows Stephanie as her mother. A.B. calls Dawn Momma.
On October 31, 2003, Dawn filed the instant declaratory judgment action, seeking to be recognized as A.B.'s legal second parent with all of the attendant rights and obligations of a biological parent. Alternatively, the complaint asserted that, even if Dawn is not A.B.'s legal second parent, she nonetheless acted in loco parentis and in a custodial and parental capacity entitling her to, at a minimum, continued visitation with A.B. Stephanie moved to dismiss the complaint for failure to state a claim upon which relief may be granted. The trial court heard argument on the motion to dismiss on March 8, 2004. Thereafter, on June 1, 2004, the trial court, with apparent reluctance, dismissed the complaint for failure to state a claim. The trial court concluded in part:
The Court is, under the circumstances presented, sympathetic to the nature of Dawn's claim, particularly in light of the apparent bonding between A.B. and her during the tenure of Dawn's relationship with Stephanie and A.B.'s best interests. The Court is also sufficiently prescient to anticipate that the law will have to extend some form of recognition to gay *129 and lesbian relationships to create a structure within which a myriad of legal issues emanating from such partnerships may be resolved, much as it has done with unmarried heterosexual couples.
* * *
More to the point of the issues in this case, there is no Indiana precedent supporting Dawn's request and a search for the public policy of this state which might provide guidance provides no clear path.
There are omens that the law related to parentage in the context of assisted conception and gay-lesbian relationships is in the early stages of development, at least in this state.
* * *
The Court has spent considerable time in research and contemplation and much additional discussion might be devoted to the arguments of the parties and the legal authorities upon which they rely. However, it is sufficient to note that Dawn has no relationship to A.B. within the context of any relationship presently given legal recognition by the State of Indiana that might permit her to claim parentage of A.B.
The State of Indiana has recognized four sources of parentage: heterosexual marriages and biological paternity, the limited circumstance of children conceived by artificial fertilization within a marital relationship with the assistance of an anonymous semen donor (Levin v. Levin, [645 N.E.2d 601 (Ind.1994)]), and adoption.
Only adoption has provided a vehicle by which gay-lesbian couples in Indiana who wish to co-parent children may avoid public policy issues and biologically-related sub-issues related to same-sex relationships. For reasons not known to the Court, Dawn did not pursue to conclusion her petition to adopt A.B. in the four years which elapsed between A.B.'s birth and the date the parties separated.
Dawn's claim could be granted only if the Court were to create by its order a relationship for which there is no statutory or judicial authority in the State of Indiana. It is not within the province of the trial court to do so.
* * *
Appendix at 5-7. Dawn appeals the dismissal of her complaint.
This case comes before us following the trial court's dismissal of Dawn's complaint pursuant to Ind. Trial Rule 12(B)(6). On appeal, we view motions to dismiss for failure to state a claim with disfavor because such motions undermine the policy of deciding causes of action on their merits. McQueen v. Fayette County Sch. Corp., 711 N.E.2d 62 (Ind.Ct.App.1999), trans. denied. Our standard of review in this regard is well settled.
A Trial Rule 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim, not the facts supporting it. Therefore, we view the complaint in the light most favorable to the non-moving party, drawing every reasonable inference in favor of this party. In reviewing a ruling on a motion to dismiss, we stand in the shoes of the trial court and must determine if the trial court erred in its application of the law. The trial court's grant of a motion to dismiss is proper if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. Furthermore, in determining whether any facts will support the claim, we look only to the complaint *130 and may not resort to any other evidence in the record.
Gorski v. DRR, Inc., 801 N.E.2d 642, 644-45 (Ind.Ct.App.2003) (citations omitted).
Dawn asserts that the trial court interpreted Levin v. Levin too narrowly and that the reasoning of that case should apply here. In particular, she claims that when a committed same-sex couple makes a joint decision to bear a child through artificial insemination and raise the child together as co-parents, Indiana law should protect the relationship between the child and her second parent in the same manner it protects the relationship between a nonbiological parent and his child born within the marriage under similar circumstances.
In Levin v. Levin, our supreme court decided an issue of first impression brought on by advancing reproductive technology, an area that our legislature has been slow to address.[1] In particular, the court was asked to determine whether a husband who consents to artificial insemination of his wife with the sperm of a third-party donor is the legal father of the resulting child. In that case, Donald Levin sought to vacate a child support order on the basis that the child was not his biological son. The supreme court held, in part, that Donald was equitably estopped from denying his child support obligation (i.e., he was legally responsible for the child),[2] explaining as follows:
The doctrine of estoppel springs from equitable principles, and it is designed to aid in the administration of justice where, without its aid, injustice might result. Our use of this doctrine is not limited to circumstances involving an actual or false representation or concealment of an existing material fact. Rather, equitable estoppel is an [sic] remedy available if one party through his course of conduct knowingly misleads or induces another party to believe and act upon his conduct in good faith without knowledge of the facts.
The trial court found that Donald induced Barbara to go forward with the artificial insemination. He consented both orally and in writing to the procedure. This consent constituted Donald's promise to become the father of the resulting child and to assume his support. Moreover, Donald held the child out as his own for fifteen years. He made no objection to declaring the child a child of the marriage in the dissolution decree in 1987. Barbara relied in good faith upon Donald's actions and consequently bore a child for which she believed both she and Donald would be responsible. Accordingly, Donald is now estopped from denying his obligations *131 toward this child. To hold otherwise would be unjust.
Levin v. Levin, 645 N.E.2d at 604-05 (citations and footnote omitted). Thus, the court found Donald "legally responsible for the child." Id. at 603-04.
While Levin v. Levin was certainly presented in the context of a marriage, the supreme court's analysis as set forth above does not expressly hinge on the marital status of the parties and is equally applicable to the case at hand. Moreover, we agree with Dawn that "no [legitimate] reason exists to provide the children born to lesbian parents through the use of reproductive technology with less security and protection than that given to children born to heterosexual parents through artificial insemination." Appellant's Brief at 11. As we have recently observed in the context of same-sex adoptions, we cannot close our eyes to the legal and social needs of our society; the strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs. Adoption of K.S.P., 804 N.E.2d 1253 (Ind.Ct.App.2004) (citing Adoption of M.M.G.C., 785 N.E.2d 267 (Ind.Ct.App.2003)).
"[O]ur paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support. Case law and commentary on the subject detail the years of litigation spent in settling these difficult issues while the children remain in limbo, sometimes denied the affection of a "parent" who has been with them from birth."
Adoption of K.S.P., 804 N.E.2d at 1259 (quoting Adoptions of B.L.V.B. & E.L.V.B., 160 Vt. 368, 376, 628 A.2d 1271, 1276 (1993)).
We encourage the Indiana legislature to help us address this current social reality by enacting laws to protect children who, through no choice of their own, find themselves born into unconventional familial settings.[3] Until the legislature enters this arena, however, we are left to fashion the common law to define, declare, and protect the rights of these children. See Ind. Const. art. I, § 12 (providing in part, "[a]ll courts shall be open; and every person, for injury done to him ... shall have remedy by due course of law"). We, therefore, hold that when two women involved in a domestic relationship agree to bear and raise a child together by artificial insemination of one of the partners with *132 donor semen, both women are the legal parents of the resulting child.
Assuming the facts alleged in the complaint to be true, as we must at this stage, it is apparent that A.B. would not have been born if Dawn and Stephanie had not agreed to be co-parents to the resulting child. Dawn, as well as her brother who acted as the semen donor, relied in good faith on Stephanie's representations in this regard. Dawn and Stephanie, as a committed couple who could not marry, determined to bear and raise a child together. With the help of reproductive technology and the donation from Dawn's brother, they engaged in a nontraditional procreative act and achieved their goal of having a child who is genetically related to both women. Dawn and Stephanie proceeded, as agreed and intended, to raise the child together, both financially and emotionally, and to hold A.B. out as the daughter of both women for several years. Even after the couple's relationship ended, Dawn continued to share in the parenting of A.B., enjoying liberal visitation with A.B. and paying monthly child support for well over a year. For the first four years of A.B.'s life, Stephanie consented to and encouraged the formation of a parent-child relationship between Dawn and A.B. A bonded, dependent parent-child relationship was, in fact, established between Dawn and A.B., and A.B. has grown up knowing Dawn as her mother in the same manner that she knows Stephanie as her mother.
Stephanie asserts, with little analysis, that establishing Dawn as a parent, over Stephanie's objection as the child's biological parent, would violate her constitutional right to make decisions concerning the custody and control of her daughter. We do not dispute that the Due Process Clause of the Fourteenth Amendment of the United States Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality); Guardianship of L.L., 745 N.E.2d 222 (Ind.Ct.App.2001), trans. denied. In the instant case, however, we have determined that both Stephanie and Dawn are the legal parents of A.B. and stand on equal footing with respect to the child. When Stephanie agreed to bear and raise a child with Dawn and, thereafter, consented to and actively fostered a parent-child relationship between Dawn and A.B., she presumptively made decisions in the best interest of her child and effectively waived the right to unilaterally sever that relationship when her romantic relationship with Dawn ended.[4]Cf. T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913 (2001) (observing, under similar circumstances, that biological mother's rights do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties' separation she regretted having done so); Parentage of L.B., 121 Wash. *133 App. 460, 484, 89 P.3d 271, 283 (2004) ("de facto parentage rule recognized by other states emphasizes the original consent of the legal parent to the relationship") (emphasis in original).
We conclude that the facts alleged in the complaint, including the reasonable inferences that can be drawn from those facts, are capable of supporting the relief sought by Dawn in her claim for declaratory judgment. Therefore, the trial court erroneously granted the motion to dismiss. We remand for further proceedings consistent with this opinion.
Judgment reversed and remanded.
DARDEN, J., and MATHIAS, J., concur.
NOTES
[1] In 1994, our supreme court observed: "The Indiana legislature has acknowledged the use of artificial insemination, though it has not addressed the support obligation of parents where artificial fertilization lead to the conception of the child." Straub v. B.M.T. by Todd, 645 N.E.2d 597, 600 (Ind.1994). The court emphasized that a good number of states have adopted legislation, based upon uniform acts, to the effect that "the donor of semen or ova, provided to a licensed physician for use in the artificial fertilization of a woman, is treated under the law as if he or she were not the natural parent of the child thereby conceived." Id. As of yet, our legislature has not responded with any such statutes. We, therefore, take it upon ourselves to conclude that a third-party donor of semen or ova, provided to a licensed physician for use in the artificial fertilization of a woman, is not a natural parent of the resulting child.
[2] With regard to a separate issue, the supreme court held that a child conceived by artificial insemination with the consent of both spouses falls within the Dissolution of Marriage Act's definition of a child of the marriage. As the parties in the case at hand were not married, this holding is not particularly relevant to our discussion.
[3] We observe that the legislature has acted to protect children born into void or voidable marriages. In the context of annulled marriages, bigamous marriages, and marriages between individuals more closely related than second cousins, the legislature has provided that in most circumstances children of these "marriages" shall be treated as if they are children of a valid marriage or a marriage that is not void. See Ind.Code Ann. § 31-13-1-1 (West 1998) (marriages between closely related relatives); I.C. § 31-13-1-2 (West 1998) (bigamous marriages); I.C. § 31-13-1-3 (West 1998) (annulled marriages).
[4] Contrary to Stephanie's assertion on appeal, Dawn's relationship with A.B. has its source in Stephanie's original consent to and fostering of said relationship, rather than in the power of the State through its judiciary. Further, we do not find Dawn's position akin to foster parents seeking to prevent the return of their foster children to the children's natural parents. As our supreme court has observed: "Unlike parent and step-parent relationships, foster relationships are designed to be temporary, providing a `safe, nurturing environment' until the child can either be returned to the natural parents or adopted by new ones." Worrell v. Elkhart County Office of Family and Children, 704 N.E.2d 1027, 1029 (Ind.1998) (quoting Indiana Foster Family Handbook 46 (1995)). Based on the facts before us, Stephanie cannot sincerely argue that the relationship between Dawn and A.B., which she helped create, was designed to be temporary.