

FILED

Oct 31 2013, 5:19 am

CLERK
of the supreme court,
court of appeals and
tax court

## FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**LESA C. DUVALL**
**STEPHANIE L. BLOOMER**
**KRISTIN D. CALDWELL**
Duvall Bloomer & Caldwell, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**AMY D. GRINER**
Griner & Company
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| A.C., | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 20A04-1301-DR-37 |
| | ) | |
| N.J., | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ELKART SUPERIOR COURT
The Honorable Stephen R. Bowers, Judge
Cause No. 20D02-1201-DR-49

**October 31, 2013**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

During the course of their same-sex domestic partnership, N.J. (Mother) and A.C. (Partner) decided to have a child together. Mother was artificially inseminated with donor semen and gave birth to C.J. (Child), and for a time, Mother, Partner, and Child functioned as a family unit. When Child was two years old, Mother and Partner ended their relationship. Thereafter, Partner exercised regular visitation with Child for several months, until Mother stopped all contact between Partner and Child. Partner then filed a petition seeking joint custody and visitation, which the trial court denied. Partner now appeals, raising the following restated issues:

1. Did the trial court err in declining to enforce the parties' agreement that Partner would be a parent to Child?

2. Did the trial court err in denying Partner's request for joint custody?

3. Did the trial court err in concluding Partner lacked standing to be granted visitation?

We affirm in part, reverse in part, and remand with instructions.[1]

Partner and Mother lived together in a same-sex domestic relationship for several years. In August 2007, when they had been together for two years, Partner and Mother had a commitment ceremony. The couple also decided to have a child via artificial insemination with donor semen, and they agreed that Mother would carry the child. As a result of the insemination, Mother became pregnant and gave birth to Child in April 2008. Partner was present at Child's birth and cut the umbilical cord.

---

[1] We held oral argument in this matter on September 24, 2013. We commend counsel on the quality of their written and oral advocacy.

After Child's birth, Mother, Partner, and Child lived together as a family unit for over two years, with the exception of an approximately two-month period shortly after Child's birth when Partner moved out due to difficulties in her relationship with Mother. During the time they all lived together, Mother was Child's primary caregiver and did not consistently work outside the home. Partner worked and provided financial support for the family for the majority of this time. Mother provided financial support as well, in the form of wages when she was working, unemployment compensation and short-term disability benefits when she was not, and student loans and a small inheritance. Child referred to Mother as "Mama" and Partner as "Mommy." *Transcript* at 9. When Child attended preschool, Mother listed Partner as the co-parent and emergency contact with the school. Mother and Partner discussed the possibility of Partner adopting Child, but no adoption proceedings were ever commenced.

Mother and Partner terminated their relationship and ceased living together in August 2010, when Child was a little over two years old. Mother maintained custody of Child and, for the next nine months, allowed Partner liberal visitation with Child—Child typically spent two or three overnights per week with Partner. According to Mother, Partner did not provide financial support during this time, with the exception of a few packages of diapers and approximately eighty dollars. Mother ended all contact between Partner and Child in July 2011 due to concerns about instability in Partner's living arrangements and possible drug use. Partner has not seen Child since October 2011, when she went to visit him at his daycare.

3

On January 18, 2012, Partner filed a petition seeking custody of Child, in which she argued it was always the parties' intent that both Partner and Mother would be considered Child's parents, and that it was in Child's best interests for Partner to have custody. Partner also asserted that she was a de facto custodian. When the matter came to trial on October 30, 2012, Partner clarified that she was seeking joint custody and visitation rather than sole custody. The trial court issued its order denying Partner's requests for joint custody and visitation on December 31, 2012. Partner now appeals.[2]

When a trial court enters findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review. *In re Visitation of M.L.B.*, 983 N.E.2d 583 (Ind. 2013). We must first determine whether the evidence supports the findings, and second, whether the findings support the judgment. *K.I. ex rel J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009). We will set aside findings of fact and conclusions of law only if they are clearly erroneous, and "'due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses.'" *M.S. v. C.S.*, 938 N.E.2d 278, 281-82 (Ind. Ct. App.

---

[2] Following oral argument in this case, Partner filed a Notice of Additional Authorities Supporting Appellant's Position. Ind. Appellate Rule 48 provides as follows:

> When pertinent and significant authorities come to the attention of a party after the party's brief or Petition has been filed, or after oral argument but before decision, a party may promptly file with the Clerk a notice of those authorities setting forth the citations. There shall be a reference either to the page of the brief or to a point argued orally to which the citations pertain, *with a parenthetical or a single sentence explaining the authority.*

(emphasis added). Far from simply alerting this court to the existence of additional authority, Partner's Notice of Additional Authority is more in the nature of an addendum to her Appellant's Brief. In it, Partner quotes long passages from a number of cases and provides arguments in support of her position. Accordingly, Partner's Notice of Additional Authority does not comply with Ind. App. R. 48. Moreover, Partner raises a federal constitutional argument for the first time in her Notice of Additional Authorities. Because she failed to raise this argument in her Appellant's Brief, it is waived. *See Chupp v. State*, 830 N.E.2d 119 (Ind. Ct. App. 2005).

2010) (quoting *K.I. ex rel J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009)).  A judgment is clearly erroneous when the record contains no evidence supporting the findings, the findings fail to support the judgment, or when the trial court applies an incorrect legal standard to properly found facts.  *M.S. v. C.S.*, 938 N.E.2d 278.

Where, as here, a trial court enters findings of fact and conclusions of law *sua sponte*, the specific findings control only as to the issues they cover, while a general judgment standard applies to issues on which the trial court has not entered findings.  *Id.*  We may affirm a general judgment on any theory supported by the evidence.  *Id.*  "As we have repeatedly observed in child custody cases, trial courts are in the position to see the parties, observe their conduct and demeanor, and hear their testimony; therefore, their decisions receive considerable deference on appeal."  *Nunn v. Nunn*, 791 N.E.2d 779, 787 (Ind. Ct. App. 2003).  Pure questions of law, however, are reviewed *de novo*.  *M.S. v. C.S.*, 938 N.E.2d 278.

1.

Because the issue is potentially dispositive, we first address Partner's argument that the trial court erred in declining to enforce the agreement between Mother and Partner that Partner would be child's second parent.  Mother does not dispute that she agreed to raise Child with Partner, but she argues that such agreements are unenforceable in Indiana.[3]

---

[3] Mother also argues that Partner has waived any argument that she acquired parental rights by virtue of the agreement between Mother and Partner by failing to raise this argument before the trial court.  We disagree.  Although it appears Partner did not use the phrase "enforceable agreement", the entire thrust of her argument below was that she should be recognized as Child's parent based on the parties' agreement and intent that she would hold that status.  We therefore conclude that Partner has preserved this question for appeal.

5

Nearly a decade ago, this court first addressed the issue of whether two women in a same-sex domestic partnership who agree to bear and raise a child together by artificial insemination of one of the partners with donor semen are both the legal parents of the resulting child. *In re A.B.*, 818 N.E.2d 126 (Ind. Ct. App. 2004), *vacated by King v. S.B.*, 837 N.E.2d 965 (Ind. 2005). In that case, King and Benham lived together in a same-sex domestic relationship for nearly nine years. The couple participated in a commitment ceremony and held themselves out to their families, friends, and communities as being committed domestic partners. Several years later, the couple decided to raise a child together and agreed that Benham would be inseminated with semen donated by King's brother. All parties involved intended for King and Benham to be the co-parents of the resulting child. King was present for and participated in A.B.'s birth, and subsequently acted as A.B.'s second parent. Additionally, King filed a petition to adopt A.B. with Benham's consent, but when the couple briefly separated prior to the completion of the adoption, Benham withdrew her consent. The couple subsequently reconciled, but did not pursue the adoption further. King and Benham ended their relationship in January 2002, and King thereafter paid monthly support and had regular and liberal visitation with A.B. until July 2003, when Benham unilaterally terminated visitation and began rejecting support payments.

Thereafter, King filed a declaratory judgment action seeking to be recognized as A.B.'s legal parent, with all the rights and obligations attendant to that status. Alternatively, the complaint asserted that even if King was not A.B.'s legal parent, she was nonetheless entitled to continued visitation because she had acted in loco parentis and in a custodial

6

capacity. Benham filed a motion to dismiss the complaint pursuant to Ind. Trial Rule 12(B)(6) for failure to state a claim on which relief may be granted, which the trial court granted. This court reversed, reasoning as follows:

> [W]e agree with [King] that "no [legitimate] reason exists to provide the children born to lesbian parents through the use of reproductive technology with less security and protection than that given to children born to heterosexual parents through artificial insemination." As we have recently observed in the context of same-sex adoptions, we cannot close our eyes to the legal and social needs of our society; the strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs.
>
> > "[O]ur paramount concern should be with the effect of our laws on the reality of children's lives. It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support. Case law and commentary on the subject detail the years of litigation spent in settling these difficult issues while the children remain in limbo, sometimes denied the affection of a "parent" who has been with them from birth."
>
> We encourage the Indiana legislature to help us address this current social reality by enacting laws to protect children who, through no choice of their own, find themselves born into unconventional familial settings. Until the legislature enters this arena, however, we are left to fashion the common law to define, declare, and protect the rights of these children. *We, therefore, hold that when two women involved in a domestic relationship agree to bear and raise a child together by artificial insemination of one of the partners with donor semen, both women are the legal parents of the resulting child.*

*In re A.B.*, 818 N.E.2d at 131-32 (citations and footnote omitted, emphasis supplied).

7

Were it still good law, *In re A.B.* might be dispositive. Our Supreme Court, however, granted transfer, vacating our opinion in full. *See* Ind. Appellate Rule 58(A); *King v. S.B.*, 837 N.E.2d 965. On transfer, the Court agreed that dismissal for failure to state a claim under Trial Rule 12(B)(6) was inappropriate, but did so on much narrower procedural grounds. The court reasoned as follows:

> Our 2002 decision, *In re Guardianship of B.H.*, in which this Court affirmed a trial court's grant of permanent guardianship to two children's stepfather after the death of their mother, rejected the children's biological father's motion to dismiss the stepfather's request. 770 N.E.2d 283 (Ind. 2002). Several things are clear from *B.H.* First, Indiana courts have authority to determine "whether to place a child with a person other than the natural parent," which we hold necessarily includes the authority to determine whether such a person has the rights and obligations of a parent. Second, Indiana law "provide[s] a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests." As such, Indiana trial courts are accorded deference in their determinations as to children's best interests in these circumstances. At least some of the relief sought in this case falls within that which *B.H.* grants persons other than natural parents to seek and Indiana trial courts, where appropriate, discretion to award.
>
> Given the procedural posture of this case and the guidance provided by *B.H.*, we find it unnecessary to comment further on the facts of this particular case or King's entitlement, if any, to the relief sought.

*King v. S.B.*, 837 N.E.2d at 967 (some citations omitted).

Justice Dickson dissented, raising a number of concerns related to the majority's holding, which he characterized as "permit[ting] a declaratory judgment action to be pursued by a woman seeking to establish her 'co-parentage' of a minor child conceived by artificial insemination and born to another woman during the two women's relationship as domestic

8

partners." *Id.* at 967.  Justice Dickson asserted that permitting such an action disregards Indiana's adoption laws, particularly the statutory requirement of maternal consent to an adoption. *Id.* at 967.  Additionally, Justice Dickson noted that

> Indiana adoption law expressly addresses stepparent adoptions, permitting them if "the adoptive parent of a child is *married* to a biological parent of the child."  In all other cases, an adoption operates to divest the child's parents of all rights with respect to the child.  In addition, same-sex marriages are prohibited in Indiana.  Even if King and [Benham] had not separated but were continuing to live together as same-sex domestic partners, it is my view that King could not lawfully adopt A.B. because stepparent adoptions require the adoptive parent to be married to the child's parent, and same-sex marriages are not permitted.  If a stepparent adoption is contrary to statute for same-sex domestic partners living together, it is likewise illegal after the termination of the couple's relationship.

*Id.* at 968-69 (footnote and citations omitted, emphasis in original).[4]  Justice Dickson also expressed concerns that the majority's holding would "open a veritable Pandora's Box of troublesome questions regarding" who might be permitted to seek parental rights notwithstanding opposition by the child's biological parent, and opined that extending such rights to only former same-sex partners "would raise grave questions" under article 1, section 23 of the Indiana Constitution.  *Id.* at 969.

Finally, Justice Dickson expressed his belief that the majority's decision was an inappropriate extension of the common law.  Specifically, he asserted that "resort to common law jurisprudence is inappropriate when employed to supersede or alter existing statutes regarding the establishment of parental status over the child of another, which has been

---

[4] In the omitted footnote, Justice Dickson expressed his disagreement with the holdings of this court that same-sex domestic partners are permitted to adopt the biological children of their partners under the stepparent adoption statutes notwithstanding the fact that they are not married.

9

governed by adoption statutes in Indiana for at least 150 years." *Id.* at 970. He further

contended that "[t]he common law should not, in my opinion, be used to provide non-

statutory privileges arising out of same-sex domestic relationships when, as here, not only is

Indiana public opinion deeply fractured, but also a significant majority of Indiana citizens

favor a public policy that does not promote same-sex families." *Id.* at 971. In support of this

assertion, Justice Dickson cited Indiana's statutory prohibition against same-sex marriage, as

well as the General Assembly's adoption of a resolution calling for a constitutional

amendment prohibiting same-sex marriage.

The majority, however, "[did] not deem [itself] to have decided the various legal

issues raised by the dissent." *Id.* at 967. In a separate concurrence, then-Chief Justice

Shepard agreed, noting that he viewed the Court's ruling as "far more modest" than Justice

Dickson suggested. *Id.*

Since *King*, the status of the law surrounding a lesbian partner's right, if any, to enjoy

the rights of a legal parent of a child born to her partner under the circumstances presented

here remains uncertain.[5] When this court decided *In re A.B.*, we solicited guidance from the

General Assembly on this issue. In the years that have passed since then, none has been

---

[5] Mother argues that "this Court has already held that same-sex partners cannot attempt to circumvent the adoption laws by entering into a co-parenting agreement." *Appellee's Brief* at 15. In support of this argument, Mother cites *M.S. v. C.S.*, 938 N.E.2d 278 (Ind. Ct. App. 2010). But in *M.S. v. C.S.*, this court held that a biological mother's former same-sex partner had waived any claim that she was the child's legal parent by failing to raise the issue before the trial court. Thus, *M.S. v. C.S.* is more properly understood as standing for the proposition that a parent and a third party *who is not a legal parent* may not circumvent the adoption laws by entering into a co-parenting agreement. Application of the waiver rule obviated the need for the court to address the question at issue in this appeal—whether a same-sex domestic partner may claim the rights of a parent.

10

forthcoming. The existing statutory framework does not contemplate the increased use of assisted reproductive technologies. Accordingly, it provides no guidance in situations where an intended parent lacks a genetic connection to the child. That deficiency is exacerbated by the growing recognition of less traditional family structures. Our system of government entrusts the General Assembly, not the courts, to fashion a framework for deciding matters as tethered to social mores and sensibilities as this subject is. We feel the vacuum of such guidance even more acutely now than we did eight years ago, when *King* was decided. Indeed, what began as a trickle is rapidly becoming a torrent, and the number of children whose lives are impacted by rules that have yet to be written only increases with the passage of time. They, and we, would welcome a legislative roadmap to help navigate the novel legal landscape in which we have arrived.

Until that happens, however, we must do the best we can to resolve the issues that come before us. In the present case, what little guidance there is comes in the form of a reversal of this court's opinion in *In re A.B.* In that case, we held that when two women in a domestic partnership agree to join together in raising a child conceived by artificial insemination of one of the partners with donor semen, both women are the legal parents of the resulting child. Our Supreme Court, however, granted transfer and vacated that opinion in full. Although the Court did not expressly disapprove of this court's holding in *In re A.B.*, we believe its decision to vacate our opinion and decide the case on a much narrower procedural basis amounts to the same thing; the Court's discomfort with the breadth of our holding bespeaks its disapproval. Therefore, we decline to reach the same result here. In the

11

absence of a legislative directive, if full parental rights are to be recognized in a former same-sex partner under the circumstances presented here, that recognition must come from our Supreme Court.

Because the facts of *King v. S.B.* are directly on point, we are unpersuaded by Partner's attempts to analogize *Tirey v. Tirey*, 806 N.E.2d 360 (Ind. Ct. App. 2004), *trans. denied*, and *Levin v. Levin*, 645 N.E.2d 601 (Ind. 1994). In *Tirey*, this court held that a man who, during dissolution proceedings, requested the entry of a support order for a child he knew was not biologically his was bound by that agreement and could not later escape his support obligation on the basis that he was not the child's father. There are a number of obvious distinctions between the facts of this case and those in *Tirey*. Specifically, *Tirey* dealt only with a support obligation; the court did not purport to bestow full parental rights on the support obligor. Moreover, the court in *Tirey* relied on dissolution statutes that are obviously inapplicable to the present case because the Mother and Partner were not married, and are indeed prohibited from marrying under Indiana law. Finally, and we think most importantly, to the extent Mother and Partner were at one point in agreement with respect to Partner's relationship with Child, that agreement was apparently never reduced to writing, much less entered as part of a court order. In *Tirey*, it was the petitioner's agreement to the entry of a support order that prevented him from later denying his support obligation.

In *Levin v. Levin*, our Supreme Court held that a husband who knowingly and voluntarily consents to the artificial insemination of his wife with donor semen is equitably estopped from later denying his support obligation to the resulting child. Partner concedes

12

that *Levin* is distinguishable from the case before us, but nevertheless argues that "the holding should be equally applicable to the biological parent who wants to prevent the nonbiological parent from continuing her role as parent to the child in all ways, including parenting time and financial support." *Appellant's Brief* at 19. In *In re A.B.*, this court agreed, and relied heavily on *Levin* in reaching its conclusion. 818 N.E.2d at 131 (reasoning that "[w]hile *Levin v. Levin* was certainly presented in the context of a marriage" its analysis "does not expressly hinge on the marital status of the parties and is equally applicable to the case at hand"). But, as we explained above, it appears to us that our Supreme Court tacitly disapproved of our interpretation of *Levin*. In light of *King v. S.B.*, if the holding in *Levin* is to be extended to the circumstances before us, we believe it is for our Supreme Court to do so. For all of these reasons, we cannot conclude that the trial court erred in declining to enforce the agreement between Mother and Partner that Partner would be Child's parent as well.

2.

Next, Partner argues that the trial court erred by applying the wrong legal standard to her request for joint custody. We disagree.

As an initial matter, although it is clear that a trial court has the authority to award custody of a child to a nonparent under certain circumstances, it should be noted that another panel has expressed the view that Ind. Code Ann. § 31-17-2-3 (West, Westlaw current with all 2013 legislation), which allows a nonparent to file a petition seeking a determination of child custody, "does not contemplate the creation of a *shared* custody arrangement between a

13

parent and a nonparent[.]" *M.S. v. C.S.*, 938 N.E.2d at 283 (emphasis supplied). But even assuming that the trial court's authority to award custody to a nonparent includes a power to require a parent to share joint custody with a nonparent, the trial court applied the correct legal standard. Our Supreme Court has set forth the standard applicable to such third-party requests for custody as follows:

> before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. . . . The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required.

*In re Guardianship of B.H.*, 770 N.E.2d 283 (Ind. 2002) (citations omitted).

In its order, the trial court cited *In re Guardianship of B.H.*, 770 N.E.2d 283 and articulated the standard set forth therein. Accordingly, we cannot conclude that the trial court applied an incorrect legal standard. Partner makes no argument that the trial court's ultimate conclusion that Partner failed to rebut the presumption in favor of Mother as the natural parent is clearly erroneous.[6] We therefore affirm the trial court's denial of Partner's request for joint custody.

---

[6] Partner does, however, argue that the trial court's conclusion that she was not a de facto custodian for the purposes of Ind. Code Ann. § 31-9-2.5 (West, Westlaw current with all 2013 legislation) was not supported by

14

3.

Finally, Partner argues that the trial court erred in concluding that she lacked standing to seek visitation with Child. This court first addressed the issue of whether visitation may be awarded to an unrelated third party in *Collins v. Gilbreath*, 403 N.E.2d 921 (Ind. Ct. App. 1980). In that case, the trial court granted a stepfather visitation with his stepdaughters following the death of his wife, the girls' mother. This court affirmed the visitation order, reasoning as follows:

> When the judicial system becomes involved in family matters concerning relationships between parent and child, simplistic analysis and the strict application of absolute legal principles should be avoided. The mere protest of a parent who asserts that visitation by another person would somehow harm his or her child should not be enough to deny visitation in all cases. This is especially true where the third party has cared for a child as his or her own. As in custody disputes, the well-being of the child must be paramount. Although the legal right of a parent to custody of a child is superior to the legal right of all others, this right is not absolute. As one court appropriately observed, a parent's right of custody is not akin to a property right, but is more in the nature of a trust which may be subject to the well-being of the child as perceived by the courts of this state.

*Id.* at 923 (citations omitted). The court went on to note, however, that its holding was not intended to "diminish the rights of a natural parent concerning his or her minor children" or to "open the door and permit the granting of visitation rights to a myriad of unrelated third persons, including grandparents, who happen to feel affection for a child." *Id.* at 923-24

---

the evidence. We need not address this argument. Even assuming Partner is a de facto custodian, she was still required to overcome the presumption in favor of Mother as the natural parent. *See In re Paternity of T.P.*, 920 N.E.2d 726, 731 (Ind. Ct. App. 2010) (holding that de facto custodians are "still required to overcome the natural parent presumption in order to gain custody"). Because the trial court applied the correct standard and concluded that Partner had not overcome the presumption in favor of the natural parent, any error in its conclusion that Partner was not a de facto custodian would be harmless.

(footnote omitted). The court explicitly limited its holding "to the type of factual situation presented by this case, i.e., where the party seeking visitation has acted in a custodial and parental capacity." *Id.* at 924.

In *Tinsley v. Plummer*, 519 N.E.2d 752, 754 (Ind. Ct. App. 1988), this court noted that "the courts, rather than the legislature, recognized rights of visitation in third parties." The court went on to conclude, however, that when it enacted the Grandparent Visitation Act without altering the visitation rights of other nonparents as established by this court, "the legislature tacitly approved *Collins* and left the development of the law on the rights of parties, other than parents and grandparents, to the sound discretion of the courts." *Id.*

For several years following *Collins*, stepparents were granted visitation upon establishing the existence of a custodial and parental relationship and that visitation is in the best interests of the child. *See Francis v. Francis*, 654 N.E.2d 4 (Ind. Ct. App. 1995); *Caban v. Healey*, 634 N.E.2d 540 (Ind. Ct. App. 1994); *In re Custody of Banning*, 541 N.E.2d 283 (Ind. Ct. App. 1989). In *Schaffer v. Schaffer*, 884 N.E.2d 423 (Ind. Ct. App. 2008), this court altered the standard applicable to petitions for third-party visitation to give special weight to a parent's decision concerning visitation, in accordance with *Troxel v. Granville*, 530 U.S. 57 (2000). Specifically, this court concluded that in considering a stepparent's request for visitation, the trial court must also consider the presumption that a fit parent acts in his or her child's best interests, the special weight afforded a fit parent's decision to deny visitation, and whether the parent has denied or simply limited visitation. *Schaffer v. Schaffer*, 884 N.E.2d 423.

This court's early third-party visitation cases did not hold, however, that standing to seek such visitation was limited to stepparents. *See, e.g., Krieg v. Glassburn*, 419 N.E.2d 1015 (Ind. Ct. App. 1981) (holding, prior to the passage of the Grandparent Visitation Act, that grandparents may be granted third-party visitation), *superseded by statute as recognized in In re Visitation of M.L.B.*, 983 N.E.2d 583 (Ind. 2013). Moreover, when third-party visitation was denied, it was not done solely on the basis that the person seeking visitation was not a stepparent. *Wolgamott v. Lanham*, 654 N.E.2d 890 (Ind. Ct. App. 1995) (affirming trial court's denial of mother's ex-boyfriend's petition to intervene in paternity action based on purported interest in visitation with child because he made no allegation that he was the child's stepparent or had even been part of the mother's household); *Tinsley v. Plummer*, 519 N.E.2d 752 (reversing award of visitation to great-aunt and great-uncle because they saw the child only five times a year at family gatherings, and therefore failed to establish a custodial and parental relationship).

Our Supreme Court substantially narrowed the scope of the right to seek third-party visitation in *Worrell v. Elkhart Cnty. Office of Family & Children*, 704 N.E.2d 1027 (Ind. 1998). In *Worrell*, our Supreme Court addressed a petition for third-party visitation filed by former foster parents. In holding that foster parents lack standing to seek third-party visitation, the Court noted that in some cases, this court had "declined to extend visitation rights to third parties who are not step-parents." *Id.* at 1029 (citing *Wolgamott v. Lanham*, 654 N.E.2d 890; *Tinlsey v. Plummer*, 519 N.E.2d 752). The Court expressed agreement "with the prior holdings limiting standing to step-parents" and held "that the right does not

extend to foster parents." *Id.* In support of its holding, the Court reasoned that "[u]nlike parent and step-parent relationships, foster relationships are designed to be temporary, providing a safe, nurturing environment until the child can either be returned to the natural parents or adopted by new ones." *Id.* (quotation omitted). The Court noted further that such relationships are contractual in nature and that foster parents are reimbursed by the State, and further noted that children are often placed in a number of different foster homes before being reunited with their natural parents or adopted. Consequently, "if each of the potential profusion of foster parents had standing because he or she had custody of the child at some point, the natural or adoptive parents might be forced to defend visitation claims against a legion of petitioners." *Id.*

This brings us to our Supreme Court's decision in *King v. S.B.*, 837 N.E.2d 965. As we explained above, in that case, same-sex domestic partners King and Benham chose to have a child together during the course of their relationship. Benham was inseminated with donor sperm and gave birth to A.B., and King functioned as A.B.'s second parent. When Benham unilaterally terminated King's visitation and began rejecting support payments, King filed a lawsuit seeking to be recognized as A.B.'s legal parent or, at a minimum, continued visitation with A.B. This court concluded that under these circumstances, Benham and King should both be considered A.B.'s legal parents. Although our Supreme Court vacated our opinion in *In re A.B.*, it reversed the trial court's dismissal of King's petition. The Court's conclusion that King's petition survived a T.R. 12(B)(6) motion to dismiss for failure to state a claim necessarily indicates that at least some of the relief sought was not barred as a matter

18

of law. *King v. S.B.*, 837 N.E.2d at 967 (noting that "[a]t least some of the relief sought in this case falls within that which [*In re Guardianship of B.H.*, 770 N.E.2d 283] grants persons other than natural parents to seek and Indiana trial courts, where appropriate, discretion to award"). Although the Court did not elaborate on which of King's claims might be legally viable, the minimum relief she sought was continued visitation with the child.

This court has made note of the uncertainty, in light of *King v. S.B.*, concerning whether former same-sex partners might fall within the class of nonparents with standing to seek third-party visitation, but we have not directly confronted the issue until today. *See Kitchen v. Kitchen*, 953 N.E.2d at 646, 649 (Ind. Ct. App. 2011) (noting that *King* and *M.S. v. C.S.* "involved the unique situation of visitation rights of a former same-sex partner to a child born during the relationship[,]" and, as such, those cases were not particularly helpful in considering whether a great-aunt and great-uncle had standing to seek visitation); *M.S. v. C.S.*, 938 N.E.2d at 286 (noting that *King v. S.B.* "casts doubt on the conclusion that third-party visitation is strictly limited to former stepparents").[7]

At the outset, we recognize that there are good reasons to limit the class of individuals with standing to seek third-party visitation. After all, parental rights are of constitutional dimension, and it is presumed that a fit parent acts in the child's best interests in making

---

[7] In *M.S. v. C.S.*, this court assumed *arguendo* that a former same-sex partner had standing to seek visitation and affirmed the trial court's denial of visitation based on best interests of the child. Mother asks us to reach the same conclusion here and affirm the trial court's denial of visitation based on an application of the best-interest standard. Even assuming that a finding that visitation is not in Child's best interest might be supported by the evidence, it is clear that the trial court made no such finding in this case. Rather, the trial court expressed its belief that it was bound, as a matter of law, to deny Partner's request for visitation, irrespective of Child's best interests, because Partner is not a parent, grandparent, or stepparent. Accordingly, we decline to affirm the trial court's denial of visitation on the basis of a best-interests analysis that never occurred.

decisions concerning visitation with third parties. *See Troxel v. Granville*, 530 U.S. 57 (2000). On the other hand, by recognizing a right to third-party visitation, this court has acknowledged that a child's interest in maintaining relationships with those who have acted in a parental capacity will sometimes trump a natural parent's right to direct the child's upbringing. Moreover, although the reasons our Supreme Court articulated in *Worrell* for denying standing to former foster parents are beyond dispute, the rationale for limiting third-party visitation to stepparents alone is less clear. It appears to us that the Court viewed a stepparent relationship as a strong indicator that a custodial and parental relationship exists. But surely custodial and parental relationships may exist with third parties other than stepparents. Indeed, the situation presented here is characterized by even stronger indicia of a custodial and parental relationship. This is so because the parties originally intended for the biological mother's partner to fulfill the role of the child's second parent and actively encouraged the development of a parental bond between the partner and the child.

We believe the Court's decision in *King v. S.B.* signaled its amenability to expanding the class of petitioners with standing to seek third-party visitation to include individuals situated similarly to Partner. Thus, in the particular factual circumstances of this case, a partner who did not give birth to the child has standing to seek visitation with the child. This is not to say that a former domestic partner is automatically entitled to visitation in these circumstances—it must still be established that visitation is in the child's best interests. We therefore reverse the trial court's conclusion that Partner lacked standing to seek visitation

with Child and remand with instructions to reconsider Partner's request for visitation under the standard set forth in our third-party visitation cases.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, J., and VAIDIK, J., concur.