## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 25 2018, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Theo Ciccarelli Cornetta
Beth Silberstein
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Justin K. Clouser
Kokomo, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.S., *Appellant-Respondent,* v. M.C., *Appellee-Petitioner* | July 25, 2018 Court of Appeals Case No. 34A04-1711-MI-2715 Appeal from the Howard Superior Court The Honorable George A. Hopkins, Judge Trial Court Cause Nos. 34D04-1705-MI-377, 34D04-1705-MI-379 |

**Altice, Judge.**

### Case Summary

[1] J.S. (Petitioner) appeals the trial court's denial of her petition for third-party visitation with M.C.'s (Mother) fraternal twins (the Children).

[2] We affirm.

## Facts & Procedural History

[3] Petitioner and Mother met while both were living in Kentucky and began dating in 2005. Mother moved back to Indiana in 2006 after her father had a massive heart attack. The couple broke up at that time but continued to communicate and eventually rekindled their relationship. Petitioner moved to Indiana in July 2007 and began living in Mother's home. Without marriage as an option in Kentucky or Indiana at the time, the couple had a commitment ceremony on September 8, 2007. Shortly thereafter, they executed reciprocal wills and powers of attorney. Additionally, Mother was added to Petitioner's health insurance.

[4] From the start of their relationship, Mother expressed her long-held desire to have children. The couple consulted fertility doctors and Mother eventually went through several rounds of artificial insemination and then a round of in vitro fertilization (IVF). All of these attempts to become pregnant failed, which took a toll on the couple's relationship. Petitioner and Mother ended their relationship in 2010, with Petitioner moving out and purchasing her own home.

[5] Despite the breakup, Mother continued with her quest to become pregnant. She discussed her decision with friends and family and indicated a preparedness to be a single parent. Mother eventually obtained a loan from her parents to pursue additional IVF treatments. Around December 2011, Mother and her mother had an initial appointment with a different fertility doctor. The first

IVF attempt with the new doctor failed in early 2012, but the second attempt was successful a few months later.

[6] Mother and Petitioner had begun talking again in 2012 and were back in an intimate relationship by the time of Mother's successful IVF round. The couple, however, continued to maintain separate residences. Petitioner attended doctor appointments with Mother and was in the operating room when the Children were born on December 12, 2012. Petitioner cut one of the umbilical cords. After Mother and the Children returned home, Petitioner assisted around the house and with their care, as did others. Petitioner spent several nights a week at Mother's home over the next several months.

[7] Mother returned to work when the Children were about four months old, and she hired a nanny, Kelly Minglin, to care for them and do household chores. Minglin, who was with the family for about two years, viewed Mother as the Children's only parent. Minglin, however, observed Petitioner at times provide care for the Children. At no point did Petitioner pay Minglin or otherwise provide financial support for the care of the Children.

[8] The couple permanently ended their romantic relationship in 2013, just prior to the Children's first birthday. They remained friends, and Petitioner continued to be involved in Mother and the Children's lives, including sometimes going on vacations and spending holidays with them. Once the Children started preschool, Petitioner, whom the Children referred to as "Dot", picked them up from school and watched them on Monday evenings so that Mother could run

errands or work late. Rita Daily, a family friend, did the same for Mother on Tuesday nights. Daily, Petitioner, and others often assisted on other nights too.

[9] Mother's friendship with Petitioner began to slowly sour in the summer of 2016, and Mother started to reduce the family's contact with her. Petitioner, however, continued to watch the Children on Mondays and even attended a Thanksgiving meal with Mother, the Children, and Mother's extended family. Following a heated conversation on December 12, 2016, Mother cut all ties with Petitioner and refused any further contact between Petitioner and the Children. Mother felt she was acting in the best interests of the Children even though they were bonded with Petitioner.

[10] On April 6, 2017, under a separate cause number for each child, Petitioner filed a verified third-party petition for parenting time. The causes proceeded in tandem and were heard together, with evidentiary hearings held on August 31 and September 22, 2017. The trial court took the matter under advisement and then issued a written ruling in each cause on October 26, 2017, denying the petitions. Petitioner appeals, and the causes have been consolidated on appeal. Additional facts will be provided below as needed.

### Discussion & Decision

[11] On review, we will set aside the trial court's findings of fact and conclusions only if they are clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of witnesses. *A.C. v. N.J.*, 1 N.E.3d 685, 688 (Ind. Ct. App. 2013). "A judgment is clearly erroneous when the record

contains no evidence supporting the findings, the findings fail to support the judgment, or when the trial court applies an incorrect legal standard to properly found facts." *Id*. "As we have repeatedly observed in child custody cases, trial courts are in the position to see the parties, observe their conduct and demeanor, and hear their testimony; therefore, their decisions receive considerable deference on appeal." *Id*. (quoting *Nunn v. Nunn*, 791 N.E.2d 779, 787 (Ind. Ct. App. 2003)).[1]

[12] To establish grounds for third-party visitation, a petitioner must first demonstrate the existence of a custodial and parental relationship with the children. *Worrell v. Elkhart Cty. Office of Family & Children*, 704 N.E.2d 1027, 1028 (Ind. 1998). After this threshold requirement is established, the petitioner must show that visitation with petitioner would be in the best interests of the children. *Id*. In other words, if the petitioner does not establish "the threshold requisite of [a] custodial and parental relationship", the court may not proceed to a best interest determination. *Id*. (quoting *Tinsley v. Plummer*, 519 N.E.2d 752, 754 (Ind. Ct. App. 1988)). The threshold requirement recognizes the constitutional dimension of parental rights and the well-established presumption that "a fit parent acts in the child's best interests in making decisions concerning visitation with third parties." *A.C.*, 1 N.E.3d at 697.

---

[1] Pure questions of law are reviewed de novo. *Id*. at 689. In this case, however, the issues turn on the facts.

[13]     Here, Petitioner clearly fell within a general class of individuals to which third-party visitation may be awarded. *See id.* at 697 (former same-sex partner had standing to seek visitation where "parties originally intended for the biological mother's partner to fulfill the role of the child's second parent and actively encouraged the development of a parental bond between the partner and the child"); *c.f. Brown v. Lunsford*, 63 N.E.3d 1057, 1064-65 (Ind. Ct. App. 2016) (holding that trial court abused its discretion by granting visitation to mother's long-term, live-in boyfriend and distinguishing *A.C.*, 1 N.E.3d 685, because the same-sex couple in *A.C.* could not be legally married in Indiana at the time of their domestic relationship). Petitioner, however, was still required to establish that she in fact had a custodial and parental relationship with the Children.

[14]     Petitioner's appellate argument is largely based on her assertions that the Children "were born of her relationship with [Mother]" and that the two co-parented the Children. *Appellant's Brief* at 9. But Mother presented ample evidence to the contrary. Further, this case is easily distinguishable from *A.C.*, where:

> Mother and Partner entered into a same-sex domestic relationship and lived together for several years. They had a commitment ceremony. They decided together to have a child and that Mother would carry the child conceived through artificial insemination. Partner was present at the child's birth, and the three lived together as a family. The child referred to Mother and Partner as "Mama" and "Mommy," respectively. Mother listed Partner as the child's co-parent on school enrollment paperwork, and the two discussed Partner adopting

the child.  When the child was two years old, Mother and
Partner ended their relationship.

*Brown*, 63 N.E.3d at 1064-65 (internal citation to *A.C.* omitted).

[15]   Like in *A.C.*, the parties had lived together for a number of years, had solidified their relationship with a commitment ceremony because same-sex marriage was not yet legal, and had decided to have children together, with Mother carrying any children.  Additionally, Petitioner was in the operating room when the Children were born, and she cut one of the umbilical cords.

[16]   Unlike *A.C.*, however, the couple broke up for over a year during which time Mother continued to pursue having children without Petitioner.  Mother obtained a loan from her parents, sought out a new fertility doctor, and began IVF treatments with the assistance of her family.  Mother had already begun the eventually-successful IVF round when she and Petitioner rekindled their relationship.  Mother then welcomed Petitioner's involvement in the doctor appointments and the birth of the Children, but she made clear that Petitioner would have no "formal legal right over the [C]hildren".  *Appellant's Brief* at 7. After the birth, Petitioner maintained a separate residence for herself, spending several nights per week at Mother's.  Petitioner helped with the Children but did not provide financially for them.  The parties ended their intimate relationship before the Children reached the age of one.  Although Petitioner remained actively involved with the family over the next few years, she did not do so in a custodial or parental manner. The facts favorable to the judgment

reveal that Mother has always been a single parent to the Children functioning with the loving assistance of others, including Petitioner.

[17] Contrary to Petitioner's assertion on appeal, the trial court did not discriminatorily focus on her sexual orientation or fail to relate its findings to its judgment. The trial court's findings properly focus on facts relevant to its determination that Petitioner did not act in a custodial and parental relationship with regard to the Children, and the nature of Mother and Petitioner's relationship was relevant to this determination. Most notably, Mother unilaterally decided to initiate the successful IVF round with the intent to be a single parent, Petitioner never provided financially for the Children, Mother and Petitioner did not live as a family unit after Mother gave birth to the Children, and Mother made all parental decisions.

[18] Under the specific facts of this case, the trial court's conclusion that Petitioner failed to demonstrate the existence of a custodial and parental relationship between herself and the Children is not clearly erroneous. Accordingly, Petitioner lacked standing to seek visitation with the Children and no best-interest determination was required.

[19] Judgment affirmed.

Najam, J. and Robb, J., concur.